1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------x
JUNIOR WALKER and TAHERA BULLEN-WALKER, on behalf
of themselves and on behalf of their infant
children T.W. and N.W.,

                          Plaintiffs,

        - against -

THE CITY OF NEW YORK, STACEY ROBINSON, Caseworker,
New York City Administration of Children's Services,
in her individual and official capacities, GLADYS
WHITE, Supervisor, New York City Administration of
Children's Services, in her individual and
official capacities, JACQUELINE MCKNIGHT,
Assistant Commissioner-Brooklyn, New York City
Administration of Children's Services, in her
individual and official capacities, SHARON ROGERS,
Deputy Director for Brooklyn Field Office,
Zone E, New York City Administration of Children's
Services, in her individual and official capacities,
BURTON LEWIS, Supervisor, New York City
Administration of Children's Services, in his
individual and official capacities, KAREN
SAWYER-BARRO, Supervisor, New York City
Administration of Children's Services, in her
individual and official capacities, NATARSKY
LOUISSAINT, Caseworker, New York City
Administration of Children's Services, in her
individual and official capacities, and JOHN
MATTINGLY, former Commissioner of the New York
City Administration of Children's Services, in his
individual and official capacities,
                      Defendants.
Civil Action No.:  12-CV-2545(WFK)(MDG)
------------------------------------------x

                  April 14, 2014


            (Continued.)

        REALTIME REPORTING, INC.
     124 East Main Street, Suite 202
       Babylon, New York 11702
         516-938-4000
      www.realtimereporting.com

2

1

2      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
3      --------------------------------------------x
       JUNIOR WALKER and TAHERA BULLEN-WALKER, on behalf
4      of themselves and on behalf of their infant
       children T.W. and N.W.,
5                                 Plaintiffs,
                    - against -
6      THE CITY OF NEW YORK, STACEY ROBINSON, Caseworker,
       New York City Administration of Children's Services,
7      in her individual and official capacities, GLADYS
       WHITE, Supervisor, New York City Administration of
8      Children's Services, in her individual and
       official capacities, JACQUELINE MCKNIGHT,
9      Assistant Commissioner-Brooklyn, New York City
       Administration of Children's Services, in her
10     individual and official capacities, SHARON ROGERS,
       Deputy Director for Brooklyn Field Office,
11     Zone E, New York City Administration of Children's
       Services, in her individual and official capacities,
12     BURTON LEWIS, Supervisor, New York City
       Administration of Children's Services, in his
13     individual and official capacities, KAREN
       SAWYER-BARRO, Supervisor, New York City
14     Administration of Children's Services, in her
       individual and official capacities, NATARSKY
15     LOUISSAINT, Caseworker, New York City
       Administration of Children's Services, in her
16     individual and official capacities, and JOHN
       MATTINGLY, former Commissioner of the New York
17     City Administration of Children's Services, in his
       individual and official capacities,
18                                 Defendants.
       Index No.:  12-CV-2545(WFK)(MDG)
19     --------------------------------------------x

20                                 100 Church Street
                                   New York, New York
21
                                   April 14, 2014
22                                 10:24 a.m.

23            Deposition of the Defendant SHARON
       ROGERS, pursuant to Notice, before Erika
24     Gunther, RPR, a Notary Public of the State of
       New York.

25

3

```
 1
 2     A P P E A R A N C E S:
 3     KATHY A. POLIAS, Attorney-At-Law
 4     Attorneys for Plaintiffs
 5            68 Jay Street, Suite 201
 6            Brooklyn, New York 11201
 7     BY:   KATHY A. POLIAS, ESQ.
 8                - and -
 9     GEORGIA E. McCARTHY, PLLC
10     Co-Counsel for Plaintiffs
11            902 East 86th Street
12            Brooklyn, New York 11236
13     BY:   GEORGIA E. McCARTHY, ESQ.
14
15     NEW YORK CITY LAW DEPARTMENT OFFICE OF THE
16     CORPORATION COUNSEL
17     Attorneys for Defendants
18            100 Church Street
19            New York, New York 10007
20     BY:   CHARLES CAREY, ESQ.
21
22
23
24
25
```

4

1

2            IT IS HEREBY STIPULATED AND

3      AGREED by and between the attorneys

4      for the respective parties herein,

5      that the filing, sealing and

6      certification of the within deposition

7      be waived.

8            IT IS FURTHER STIPULATED AND

9      AGREED that all objections, except

10     as to the form of the question,

11     shall be reserved to the time of the

12     trial.

13           IT IS FURTHER STIPULATED AND

14     AGREED that the within deposition

15     may be sworn to and signed before

16     any officer authorized to administer an

17     oath with the same force and effect as

18     if signed and sworn to before the

19     Court.

20

21               - oOo -

22

23

24

25

5

1

2      S H A R O N   R O G E R S, called as a

3            witness, having been duly sworn by a

4            Notary Public, was examined and

5            testified as follows:

6      EXAMINATION BY

7      MS. POLIAS:

8            Q.      Please state your full name for

9      the record.

10           A.      Sharon Rogers.

11           Q.      What is your address?

12           A.      ███████████████████████

13      ████████ .

14           Q.      Good morning, Ms. Rogers.

15           A.      Good morning.

16           Q.      My name is Kathy Polias.  I'm

17      representing plaintiffs Junior Walker and

18      Tahera Bullen-Walker in a case that's

19      currently pending in the Eastern District of

20      New York - it's a federal case - against the

21      City of New York and some of its employees.

22      You're included among those employees.

23                  This morning I'm going to be

24      asking you some questions regarding the claims

25      in our -- our claims in this action as well as

84

1                          Rogers

2          Q.      Was physical abuse one of the

3   circumstances under which the ACS caseworker

4   or supervisor would call the IRT coordinator?

5          A.      Yes.  It falls under IRT as well,

6   marks and bruises.

7          Q.      Okay.

8                  Are you familiar with the Walker

9   family?

10         A.      No.

11         Q.      Prior to this lawsuit being

12  brought, had you ever heard about any of the

13  Walkers?

14         A.      Not that I recall, no.

15         Q.      Okay.

16                 Before this lawsuit was

17  brought --

18                 MS. POLIAS:  Withdrawn.

19         Q.      Do you know a person by the name

20  of Gladys White?

21         A.      Yes.

22         Q.      Who is Gladys White?

23         A.      She's retired.  She used to be a

24  supervisor with ACS.

25         Q.      Did she have the title of

85

                              Rogers

1

2       Supervisor II when you were in the Grant

3       Square office?

4            A.     Yes.

5            Q.     Did she supervise a protective

6       diagnostic unit?

7            A.     Yes.

8            Q.     Do you recall her ever discussing

9       the case about -- the case that this lawsuit

10      is about with you?

11           A.     No.

12           Q.     Do you recall anyone else in the

13      office ever discussing the case that this

14      lawsuit is about with you?

15           A.     No.

16           Q.     Do you know a person by the name

17      of Stacey Robinson?

18           A.     Yes.

19           Q.     Was Stacey Robinson a caseworker

20      in the Grant Square office when you were

21      there?

22           A.     Yes.

23           Q.     Did she work in Gladys White's

24      unit?

25           A.     Yes.

86

Rogers

1

2     Q.     Do you recall her saying anything

3     to you about this case before --

4              MR. CAREY:  Objection.  I'm

5         sorry.

6         Q.     -- before this lawsuit was

7     brought?

8              MR. CAREY:  Objection.  You can

9         answer.

10        A.     I don't recall.

11        Q.     Do you recall -- do you know a

12    person by the name of Junior Walker?

13        A.     No.

14        Q.     Do you recall ever speaking on

15    the phone to a person by the name of Junior

16    Walker?

17        A.     No.

18        Q.     When you were in the Grant Square

19    office in 2008 and 2009; is that correct?

20        A.     Yes.

21        Q.     During that time do you recall

22    Gladys White ever approaching you about any

23    problems that she was having in any one of her

24    cases?

25        A.     That's like -- for me I walk the

87

Rogers

1

2    floors.  People talk to me.  No, I don't

3    recall.

4         Q.    Do you recall Stacey Robinson

5    ever approaching you about any problems that

6    she was having in any one of her cases?

7         A.    Like I said, when I walk the

8    floors I talk to staff.  I don't recall a

9    particular case name, no.

10         Q.    Okay.

11         Do you recall any particular case

12    names with regard to discussions that you had

13    with Karen Sawyer-Barro?

14         A.    No.

15         Q.    When you were in the Grant Square

16    office, did you play any role in the family

17    meeting?

18         A.    I don't understand that question.

19         Q.    You testified that when you were

20    in the Grant Square office something called

21    family meetings were held.

22         A.    Right.

23         Q.    Did you play any role in those

24    family meetings?

25         A.    No.

88

1                      Rogers

2        Q.      Okay.

3                When you were in the Grant Square

4    office, before a child safety conference was

5    held, was the manager -- was the approval of

6    the manager to hold the conference required?

7        A.      Yes.

8        Q.      Who requested the approval of the

9    manager?

10       A.      No one requested it.  It's

11   usually standard.  The manager reads off on it

12   and forwards the request for the conference.

13       Q.      Forwards the request to who?

14       A.      To the child evaluation

15   specialist.

16       Q.      Okay.

17               Could the caseworker or

18   supervisor tell the manager that they believe

19   that --

20               MS. POLIAS:  Withdrawn.

21       Q.      Are you saying that the holding

22   of a child safety conference had to be at the

23   initiative of the manager?

24       A.      No.  We talked about approval.

25       Q.      Okay.

89

1          Rogers

2          If the caseworker or supervisor

3    wanted to hold a child safety conference, they

4    had to get the manager's approval; is that

5    correct?

6          A.    They discussed the case with the

7    manager to make sure that they had enough to

8    move forward with a child safety conference

9    and that they were clear in terms of what they

10   needed to address.

11         Q.    Okay.

12         Did they have to submit any forms

13   or documents to the manager in order to hold

14   the child safety conference?

15         A.    The request form goes to the

16   manager for review, as well as to the child

17   evaluation specialist.

18         Q.    Okay.

19         What was the manager required to

20   review the request form for?

21         A.    A discussion with the staff to

22   make sure that they were clear and make sure

23   they were headed in the right direction.

24         Q.    Okay.

25         A child safety conference could

90

1                          Rogers

2      only be held when there were safety concerns;

3      is that correct?

4              A.      Yes.

5              Q.      Okay.

6                      That was the case in 2009 when

7      you were in the Grant Square office?

8              A.      Yes.

9              Q.      Would the manager approve --

10     before forwarding the form or the request to

11     the child evaluation specialist, would the

12     manager have to approve the holding of a child

13     safety conference?

14             A.      They have the preconference to

15     discuss it, and then it is submitted and

16     forwarded to the child evaluation specialist.

17             Q.      Who fills out the initial child

18     safety conference form?

19             A.      The supervisor or the worker.

20             Q.      It's a request form; is that

21     correct?

22             A.      Right.

23             Q.      The request was directed to the

24     manager; is that correct?

25             A.      The form is submitted to the

91

1                      Rogers

2     manager for review and discussion and

3     preconference.

4            Q.      Okay.

5                    Could the manager deny the

6     request for the child safety conference?

7            A.      Yes.

8            Q.      If the manager forwarded the

9     paperwork to the child evaluation specialist,

10    did that mean that the manager had approved

11    the holding of a child safety conference?

12           A.      Yes.

13           Q.      What did the child evaluation

14    specialist do?

15           A.      Facilitate the conference.

16           Q.      As far as you're aware when you

17    were in the Grant Square office, what steps

18    did the child evaluation specialist take to

19    facilitate the conference?

20           A.      They facilitate the conference

21    with the family and the worker in the room and

22    just go through the six stages of the

23    conference and the discussion.

24           Q.      What were the stages of the

25    conference?

92

Rogers

1

2      A.      I don't recall.

3      Q.      Okay.

4              Were there any steps that the

5      child evaluation specialist was required to

6      take prior to holding the conference?

7      A.      Just a discussion with the team

8      in terms of who is going to be present, things

9      like that, review of the form and discussion

10     in terms of that.

11     Q.      Were there any circumstances

12     under which you were present at child safety

13     conferences in the Grant Square office?

14     A.      Yes.

15     Q.      What circumstances were those?

16     A.      Usually if they have a problem

17     with the decision I'm called in because

18     they're stuck at a decision and can't come to

19     a consensus or usually if it's a high-profile

20     case and they need me to sit in.  Usually it

21     depends.

22     Q.      Is it correct that -- at the time

23     did your --

24              MS. POLIAS:  Withdrawn.

25     Q.      At the time you were in the Grant

93

1                         Rogers

2     Square office, ACS had a legal unit; is that

3     correct?

4          A.    We still have a legal unit.  I

5     don't understand.

6          Q.    Okay.

7                Do you have a unit called the

8     legal services unit?

9          A.    Yes.

10         Q.    Okay.

11               Is that unit composed of

12    attorneys?

13         A.    Not in the office.  Is that what

14    you're asking me?

15         Q.    No, I'm asking in all of ACS.

16         A.    Yes.

17         Q.    As far as you know, are those

18    attorneys responsible for filing Article 10

19    petitions?

20         A.    Yes.

21         Q.    Are those attorneys responsible

22    for prosecuting Article 10 petitions?

23         A.    Yes.

24         Q.    When you were in the Grant Square

25    office, did your office in any way notify the

94

Rogers

1

2       legal services unit before you held a child

3       safety conference?

4               A.      Sometimes they sent them

5       notification.  They get a copy of the request

6       form in terms of, We're holding a conference

7       on this family today.  Just basically give

8       them a heads-up in terms of volume, what our

9       day looks like in terms of planning.

10              Q.      Okay.

11                      Why did you notify them before

12      the child safety conference?

13              A.      Planning.

14              Q.      Okay.

15                      Was the reason why you notified

16      them so that if the outcome -- the outcome of

17      the conference was court intervention, the

18      legal services unit would be ready to go

19      forward with that?

20              A.      Expectation in terms of the

21      volume, because, you know, with the volume for

22      the borough with seven different sites, they

23      need to have an -- I guess an estimate in

24      terms of what their day may look like and who

25      to expect around what time, so we notify them

95

1                              Rogers

2      at the beginning of the day how many we're

3      having and when they end and what the outcome

4      is so that they have -- you know, they're

5      ready to handle the volume if everyone is

6      coming to court.  Planning.

7            Q.      Okay.

8                    When you were in the Grant Square

9      office, if you were not sitting in on the

10     child safety conference were the people

11     involved in the child safety conference

12     required to get your approval or permission

13     before pursuing a certain outcome?

14           A.      No, only on -- I'm sorry, Child

15     Safety Alert 14 was the only cases.

16           Q.      Child Safety Alert 14s, what are

17     those?

18           A.      Newborns born to parents with

19     children in foster care.

20           Q.      When you were in the Grant Square

21     office, if a supervisor was going to pursue --

22     if a supervisor and/or caseworker were going

23     to pursue a removal of a child, they did not

24     have to get your permission?

25           A.      No.  The outcome comes from a

96

1                           Rogers

2      child safety conference.

3           Q.    Was a child safety conference

4      always required before removal was done?

5           A.    If there was an emergency

6      removal, no.

7           Q.    Okay.

8           A.    Other than that, yes.

9           Q.    Okay.

10                Were there any circumstances

11     besides Child Safety Alert 14s where the

12     people involved in the child safety conference

13     had to get your approval before pursuing a

14     certain course of action?

15          A.    As I stated earlier, only when

16     they can't reach a consensus am I notified to

17     help them come up with a decision.

18          Q.    Okay.

19          A.    Other than that, no.

20          Q.    Okay.

21                I'm going to show you some

22     documents, Ms. Rogers.

23                MS. POLIAS:  I've marked this

24           before, but I'd like to mark it again.

25           Could you mark this Plaintiffs'

97

1                           Rogers

2           Exhibit 1.

3                   (Plaintiffs' Exhibit 1,

4           Investigation Progress Notes, marked for

5           identification.)

6           Q.    Ms. Rogers, this is a 20-page

7     exhibit with a title, "Investigation Progress

8     Notes."  I'd like you to take a cursory look

9     through it.

10                  Ms. Rogers, do you recognize this

11    format as being entries into Connections?

12          A.    Yes.

13          Q.    Before this lawsuit was brought,

14    do you recall seeing any of the entries that

15    are comprised in Exhibit 1?

16          A.    No.

17          Q.    You can put that aside.

18    Actually, you can give it back to me.  Thank

19    you.

20                  When you were in the Grant Square

21    office, did you have any -- did you play any

22    role in Article 10 proceedings that were

23    brought by your office?

24          A.    I'm not sure what you mean.

25          Q.    Okay.

98

1              Rogers

2              When you were in the Grant Square

3    office, your office was involved in initiating

4    Article 10 proceedings; is that correct?

5         A.    Yes.

6         Q.    Did you play any role in the

7    initiation of the Article 10 proceeding?

8         A.    The child safety conference is

9    the venue that the court proceedings come

10   from, not from me.

11        Q.    Okay.

12             Did you play any role in the

13   actual proceeding, the actual proceeding in

14   court?

15        A.    No.

16        Q.    Can you ever go to court --

17             MS. POLIAS:  Withdrawn.

18        Q.    As a deputy director of

19   operations for any office, have you ever gone

20   to court for any Article 10 proceeding?

21        A.    No.

22        Q.    When you were in the Grant Square

23   office, if a case progressed to an Article 10

24   proceeding, was the caseworker on the case

25   required to attend all the court appearances?

99

1                         Rogers

2          A.      Yes.

3          Q.      Was the caseworker's supervisor

4     required to attend all the court appearances?

5          A.      No.

6          Q.      Under what circumstances was the

7     supervisor required to attend a court

8     appearance?

9          A.      If the judge requested it.

10         Q.      Okay.

11                 Were there any circumstances

12    under which you were required to attend the

13    court appearances?

14         A.      If the judge requested.

15         Q.      During your tenure as deputy

16    director of operations of any office, have you

17    ever been called as a witness in a family

18    court proceeding?

19         A.      No.

20         Q.      Prior to being deputy director of

21    operations, what position did you hold?

22         A.      Child protective manager.

23         Q.      What office did you hold that

24    position in?

25         A.      1274 Bedford, 2554 Linden

100

1                          Rogers

2     Boulevard.

3              Q.      Okay.

4                      Did you hold any other positions

5     in the Grant Square office besides deputy

6     director of operations?

7              A.      No.

8              Q.      Have you ever held the position

9     of Supervisor II?

10             A.      Yes.

11             Q.      Okay.

12                     What about Supervisor I?

13             A.      Yes.

14             Q.      And caseworker as well; is that

15    correct?

16             A.      Yes.

17             Q.      How many years were you a

18    caseworker?

19             A.      Oh, my God, about three years.

20             Q.      Okay.

21             A.      A long time.

22             Q.      During your tenure at ACS or

23    during your employment with ACS, have you ever

24    seen a mark on a child that was caused by a

25    belt?

101

1                          Rogers

2          A.      It's been so long.  Yes.

3          Q.      As far as you knew, was it caused

4     by the buckle of the belt or the strap of the

5     belt?

6          A.      I've seen both.

7          Q.      Okay.

8                  On how many occasions have you

9     seen a mark caused by a belt on a child?

10         A.      I can't -- I don't recall exact

11    numbers.

12         Q.      Did you only see such marks when

13    you were a caseworker, or have you seen them

14    when you were in other titles as well?

15         A.      Other titles as well.

16         Q.      Did you see any such marks when

17    you were the deputy director of operations?

18         A.      Yes.

19         Q.      You've been deputy director of

20    operations for about seven years?

21         A.      Yes.

22         Q.      According to the knowledge and

23    experience that you've obtained while you've

24    been at ACS, has hitting a child with a belt

25    always caused a mark?

102

1                         Rogers

2        A.      Marks, bruises, it varies.

3        Q.      Did you receive any training or

4    instruction at any point on what a mark caused

5    by a belt buckle looks like?

6        A.      We have medical consultants.  We

7    consult usually with our medical consultants

8    or doctor to help us understand a mark because

9    we're not experts in that field, so we have

10   medical consultants on site, and we consult

11   usually with a doctor, an expert.

12       Q.      Okay.

13               Have you ever received yourself

14   any training in what a mark caused by a belt

15   buckle or belt strap would look like?

16       A.      Again, we usually consult with

17   the medical experts or someone who is an

18   expert in that field to help us understand

19   what that mark is and where it came from --

20   possibilities in terms of where it may come

21   from.

22       Q.      Under what circumstances would

23   you consult with a medical expert or

24   consultant?

25       A.      Usually if we're not sure, if the

1                      Rogers

2    explanation is not consistent with the injury

3    or we just need clarity in terms or what it

4    is, how serious it is, things like that, and

5    if it needs a medical follow up.

6           Q.      Okay.

7                   Are those the circumstances under

8    which you would seek a medical consultant or a

9    medical expert's assistance under ACS policy?

10          A.      That's just some of them.

11          Q.      Okay.

12                  Are these medical experts or

13   medical consultants employed by the City of

14   New York?

15          A.      Yes.

16          Q.      Do they actually work within ACS?

17          A.      Yes.

18          Q.      Where are they located?

19          A.      Different offices.  Each borough

20   has a certain amount at different sites.

21          Q.      Did you have any at your site in

22   Grant Square?

23          A.      She -- we shared one between

24   another site and our site.

25          Q.      What was her name?

Rogers

1

2      A.      I don't recall.

3      Q.      Was she a physician?

4      A.      No, nurse practitioners.

5      Q.      When you were at the Grant Square

6  office, where were children who had just been

7  removed taken by the caseworkers?

8      A.      Usually to the nursery to see the

9  nurse to get a medical clearance.

10     Q.      Okay.

11             Where was that nursery located?

12     A.      It's at 2554 Linden Boulevard.

13     Q.      Do you know a person by the name

14  of Geneva White who is a nurse?

15     A.      I don't know the nurse's name.

16     Q.      Is the location of 2554 Linden

17  Boulevard part of ACS?

18     A.      Yes, it is.

19     Q.      What did the caseworker do after

20  getting the medical clearance at 2554 Linden

21  Boulevard?

22     A.      The child goes to placement once

23  medically cleared.

24     Q.      Okay.

25             Were there any facilities at that

1                          Rogers

2      location where the child could stay

3      temporarily?

4              A.      Yes, the nursery.

5              Q.      Okay.

6                      There are beds in the nursery?

7              A.      No.  This is a nursery -- cribs,

8      maybe, but not beds.  TV, play area for the

9      children to wait.

10             Q.      What did the caseworker do in

11     order to place the child when you were in the

12     Grant Square office?

13             A.      I'm not sure what you mean.

14             Q.      What did the caseworker do with

15     the child after taking him or her to the

16     nursery?

17             A.      They're medically cleared.  If

18     there's a need to seek immediate medical

19     treatment by a doctor they're taken to the

20     hospital.  If not, the worker and the child

21     evaluation specialist usually submits all the

22     documents to our office of placement who seeks

23     out a placement.  Once they find a placement,

24     they call the worker back.  The worker takes

25     the child to that particular placement.

106

1                        Rogers

2          Q.      Did that office work with any

3    agencies to be able to get a placement?

4          A.      Yes.  That's their job.

5          Q.      Are you familiar with the Little

6    Flower agency?

7          A.      Yes.

8          Q.      Was that one of the agencies that

9    that office worked with?

10         A.      Yes.

11         Q.      Okay.

12                 Are you familiar with the term

13   kinship source?

14         A.      Yes.

15         Q.      Okay.

16                 What is a kinship source?

17         A.      Usually a resource, can be a

18   family member or kin, as a support for the

19   child to avoid nonkinship, nonfamilial

20   placements.

21         Q.      Okay.

22                 When you were in the Grant Square

23   office, according to your understanding of the

24   ACS policy, was the caseworker required to

25   assess whether there were any kinship sources

107

1                          Rogers

2    where the child could say?

3          A.      Yes.

4          Q.      How would the caseworker do that?

5          A.      Speak to the family.

6          Q.      Okay.

7                  Was the office of child placement

8    involved even if there was a kinship source

9    that the children could stay with?

10         A.      If that resource is going to be a

11   foster parent.

12         Q.      Okay.

13                 "Foster parent" meaning someone

14   not in the family?

15         A.      No, foster parent is kin.

16   Kinship is foster parent, but it's a relative.

17         Q.      Okay.

18                 Did the office of child placement

19   actually make the arrangements with the

20   kinship source to have the children placed

21   with them?

22         A.      No.  Usually the office of

23   placement connects that family member to a

24   foster care agency who comes out and certifies

25   the home.

1                           Rogers

2          Q.      Okay.

3                  That's the process even if

4    there's a kinship source; is that correct?

5          A.      It's handled, right, a little

6    differently than regular foster -- nonfamily

7    foster care, but it's the same process in

8    terms of certification.

9          Q.      The foster agency was the one to

10   actually contact the kinship source; is that

11   correct?

12         A.      Right -- no, we contact them

13   initially, but they follow up afterwards.

14         Q.      Okay.

15                 How long did that process

16   normally take?

17         A.      Which process?

18         Q.      The process of contacting and

19   placing the children with the kinship source?

20         A.      That can happen immediately, or

21   it can happen a few days down the line.

22         Q.      Where did the children stay in

23   the meantime if it happened a few days down

24   the line?

25         A.      With nonkinship in foster care.

109

1                    Rogers

2        Q.      Okay.

3                Ms. Rogers, I'm putting before

4    you what's been previously marked as

5    Plaintiffs' Exhibit 3 as of December 10, 2013.

6        A.      She doesn't get it first

7    (indicating).

8        Q.      No, because this is already

9    marked.

10               MS. POLIAS:  I'm sorry, Charles,

11           this has writing on the back.

12               MR. CAREY:  That's okay.  Thank

13           you.

14       Q.      If you could take a look through

15   the pages.  It's a six-page document entitled

16   "Office of Children and Family Services Child

17   Protective Services Intake Report" Bates

18   stamped JW419 to JW424.

19               Ms. Rogers, do you recognize this

20   document?

21       A.      Yes.

22       Q.      Did you ever see this document

23   before this lawsuit was brought?

24       A.      Not that I recall.

25       Q.      You only viewed this document

110

1                      Rogers

2      after this lawsuit had already been filed?

3              A.      As far as I recall, yes.

4              Q.      You can put that aside.

5              MS. POLIAS:  If you can mark this

6              as Plaintiffs' Exhibit 2, please.

7                      (Plaintiffs' Exhibit 2, Letter

8              dated June 28, 2010, marked for

9              identification.)

10             Q.      Please take a moment, Ms. Rogers,

11     and look through this document.  It's a

12     two-page document Bates numbered by the

13     plaintiff 0445 to 0446.  It's dated June 28,

14     2010, and it's a letter.

15                     Ms. Rogers, do you recognize

16     Plaintiffs' Exhibit 2 marked as of today?

17             A.      No.

18             Q.      Do you recall ever seeing it?

19             A.      I don't recall.

20             Q.      Okay.

21                     When you were in the Grant Square

22     office, was there anybody in the office

23     responsible for receiving the mail?

24             A.      Yes.

25             Q.      Who was responsible for that?

136

1

2            ------------------I N D E X--------------------

3      WITNESS                    EXAMINATION BY          PAGE

4      SHARON ROGERS        MS. POLIAS                  5

5

6            ------------------EXHIBITS--------------------

7      PLAINTIFFS'                              FOR I.D.

8          1          Investigation Progress

9                     Notes                          97

10         2          Letter dated June 28, 2010    110

11

12                    (Counsel retained exhibits.)

13

14

15

16

17

18

19

20

21

22

23

24

25

149

1

2                    C E R T I F I C A T E

3

    STATE OF NEW YORK    )
4
                         ) ss.:
5
    COUNTY OF NASSAU     )

6

7              I, ERIKA GUNTHER, RPR, a Notary

8          Public within and for the State of New

9          York, do hereby certify:

10             That SHARON ROGERS, the witness

11         whose deposition is hereinbefore set

12         forth, was duly sworn by me and that

13         such deposition is a true record of the

14         testimony given by such witness.

15             I further certify that I am not

16         related to any of the parties to this

17         action by blood or marriage; and that I am

18         in no way interested in the outcome of

19         this matter.

20             IN WITNESS WHEREOF, I have

21         hereunto set my hand this 22nd day of

22         April, 2014.

23

24                    -------------------------

25                    ERIKA GUNTHER, RPR