1

1

2      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK

3      ------------------------------------------x
       JUNIOR WALKER and TAHERA BULLEN-WALKER, on behalf

4      of themselves and on behalf of their infant
       children T.W. and N.W.,

5                                  Plaintiffs,
                      - against -

6      THE CITY OF NEW YORK, STACEY ROBINSON, Caseworker,
       New York City Administration of Children's Services,

7      in her individual and official capacities, GLADYS
       WHITE, Supervisor, New York City Administration of

8      Children's Services, in her individual and
       official capacities, JACQUELINE MCKNIGHT,

9      Assistant Commissioner-Brooklyn, New York City
       Administration of Children's Services, in her

10     individual and official capacities, SHARON ROGERS,
       Deputy Director for Brooklyn Field Office,

11     Zone E, New York City Administration of Children's
       Services, in her individual and official capacities,

12     BURTON LEWIS, Supervisor, New York City
       Administration of Children's Services, in his

13     individual and official capacities, KAREN
       SAWYER-BARRO, Supervisor, New York City

14     Administration of Children's Services, in her
       individual and official capacities, NATARSKY

15     LOUISSAINT, Caseworker, New York City
       Administration of Children's Services, in her

16     individual and official capacities, and JOHN
       MATTINGLY, former Commissioner of the New York

17     City Administration of Children's Services, in his
       individual and official capacities,

18                                  Defendants.
       Civil Action No.:  12-CV-2545(WFK)(MDG)

19     ------------------------------------------x

20                                  April 14, 2014

21
                      (Continued.)

22

23                REALTIME REPORTING, INC.
              124 East Main Street, Suite 202

24              Babylon, New York 11702
                      516-938-4000

25              www.realtimereporting.com

2

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK

3  ------------------------------------------x
   JUNIOR WALKER and TAHERA BULLEN-WALKER, on behalf

4  of themselves and on behalf of their infant
   children T.W. and N.W.,

5                              Plaintiffs,
                    - against -

6  THE CITY OF NEW YORK, STACEY ROBINSON, Caseworker,
   New York City Administration of Children's Services,

7  in her individual and official capacities, GLADYS
   WHITE, Supervisor, New York City Administration of

8  Children's Services, in her individual and
   official capacities, JACQUELINE MCKNIGHT,

9  Assistant Commissioner-Brooklyn, New York City
   Administration of Children's Services, in her

10 individual and official capacities, SHARON ROGERS,
   Deputy Director for Brooklyn Field Office,

11 Zone E, New York City Administration of Children's
   Services, in her individual and official capacities,

12 BURTON LEWIS, Supervisor, New York City
   Administration of Children's Services, in his

13 individual and official capacities, KAREN
   SAWYER-BARRO, Supervisor, New York City

14 Administration of Children's Services, in her
   individual and official capacities, NATARSKY

15 LOUISSAINT, Caseworker, New York City
   Administration of Children's Services, in her

16 individual and official capacities, and JOHN
   MATTINGLY, former Commissioner of the New York

17 City Administration of Children's Services, in his
   individual and official capacities,

18                              Defendants.
   Index No.:  12-CV-2545(WFK)(MDG)

19 ------------------------------------------x

20                         100 Church Street
                          New York, New York

21
                          April 14, 2014

22                        10:24 a.m.

23         Deposition of the Defendant SHARON
   ROGERS, pursuant to Notice, before Erika

24 Gunther, RPR, a Notary Public of the State of
   New York.

25

3

1

2     A P P E A R A N C E S:

3     KATHY A. POLIAS, Attorney-At-Law

4     Attorneys for Plaintiffs

5          68 Jay Street, Suite 201

6          Brooklyn, New York 11201

7     BY:   KATHY A. POLIAS, ESQ.

8               - and -

9     GEORGIA E. McCARTHY, PLLC

10    Co-Counsel for Plaintiffs

11         902 East 86th Street

12         Brooklyn, New York 11236

13    BY:   GEORGIA E. McCARTHY, ESQ.

14

15    NEW YORK CITY LAW DEPARTMENT OFFICE OF THE

16    CORPORATION COUNSEL

17    Attorneys for Defendants

18         100 Church Street

19         New York, New York 10007

20    BY:   CHARLES CAREY, ESQ.

21

22

23

24

25

4

1

2          IT IS HEREBY STIPULATED AND

3      AGREED by and between the attorneys

4      for the respective parties herein,

5      that the filing, sealing and

6      certification of the within deposition

7      be waived.

8          IT IS FURTHER STIPULATED AND

9      AGREED that all objections, except

10     as to the form of the question,

11     shall be reserved to the time of the

12     trial.

13         IT IS FURTHER STIPULATED AND

14     AGREED that the within deposition

15     may be sworn to and signed before

16     any officer authorized to administer an

17     oath with the same force and effect as

18     if signed and sworn to before the

19     Court.

20

21              - oOo -

22

23

24

25

7

                              Rogers

1

2          A.      Yes.

3          Q.      Is there any reason why you would

4    not be able to testify truthfully today?

5          A.      No.

6          Q.      Are you currently taking any

7    medication that you believe affects your

8    ability to tell the truth or to remember

9    things?

10         A.      No.

11         Q.      Okay.

12                 Ms. Rogers, are you currently

13   employed by the City of New York?

14         A.      Yes.

15         Q.      What's your title with the City

16   of New York?

17         A.      Deputy director of operations.

18         Q.      Is that for the Administration

19   for Children's Services?

20         A.      Yes.

21         Q.      For convenience sake, I'm going

22   to be referring to Administration for

23   Children's Services as ACS; is that okay?

24         A.      Yes.

25         Q.      Okay.

8

Rogers

1

2          How long have you been employed

3     by the City of New York?

4          A.     A while.   Twenty -- this year

5     will be 29.

6          Q.     Okay.

7               How long have you held the

8     position of deputy director of operations?

9          A.     Seven years.

10          Q.     Did you hold that position back

11    in 2009?

12          A.     Yes.

13          Q.     What is your -- what are your

14    responsibilities and duties as deputy director

15    of operations?

16          A.     Actually, I'm in charge of a

17    site.   I manage, lead, supervise, develop,

18    train and ensure that policy and procedures

19    are followed by staff.

20          Q.     Which site is that?

21          A.     I'm currently at 404 Pine Street.

22          Q.     Okay.

23               How long have you been at 404

24    Pine Street?

25          A.     About four years.   Three, four

9

1                        Rogers

2      years.

3              Q.      Were you at that site in 2009?

4              A.      No.

5              Q.      Which site were you at in 2009?

6              A.      I believe I was at Grant Square.

7              Q.      What was the address of that?

8              A.      Wow, you don't know how much I

9      move.  19 -- 19 Grant Square, right.

10             Q.      Did you hold the same position of

11     deputy director of operations at the Grant

12     Square office?

13             A.      Yes.

14             Q.      What is the function of the

15     office at 404 Pine Street?

16             A.      I'm not sure what you're asking

17     me.

18             Q.      Okay.

19                     Does the office at 404 Pine

20     Street conduct investigations into allegations

21     of abuse and neglect involving children?

22             A.      Yes.

23             Q.      Did the Grant Square office also

24     serve that same function?

25             A.      Yes.

10

Rogers

1
2      Q.      During what years were you at the

3  Grant Square office?

4      A.      Between two thousand -- 2008,

5  2009, approximately that time.

6      Q.      Okay.

7              How many years were you there

8  for?

9      A.      Between 2008, 2009.  I'd say

10  about two years.

11      Q.      Only two years, okay.

12              Did you have people under your

13  supervision when you were in the Grant Square

14  office?

15      A.      Yes.

16      Q.      How many people did you have

17  under your supervision?

18      A.      I believe it was about one, two,

19  three, four -- about four, five people.

20      Q.      Okay.

21              What were the titles of those

22  people?

23      A.      Four child protective managers,

24  one assistant.

25      Q.      Okay.

```
                                                          11
 1                           Rogers

 2                 Was the office, during the time

 3       that you were deputy director of operations

 4       there, divided into units or sectors?

 5            A.      Yes.

 6            Q.      What units or sectors was it

 7       divided into?

 8            A.      I'm not sure what you're asking.

 9            Q.      Did the Grant Square office --

10       during the time that you were deputy director

11       of operations there, was it organized into

12       units?

13            A.      Yes.

14            Q.      How many units were there?

15            A.      I believe there was 12.

16            Q.      Okay.

17                   Which units --

18                   MS. POLIAS:   Withdrawn.

19            Q.      Which unit or units were involved

20       in investigating allegations of abuse and

21       neglect involving children?

22            A.      All of them.

23            Q.      Okay.

24                   The office was located in

25       Brooklyn; is that correct?
```

12

1                         Rogers

2          A.      Yes.

3          Q.      Did it have a specific

4    jurisdiction within Brooklyn?

5          A.      Yes.

6          Q.      What areas or neighborhoods did

7    it cover?

8          A.      Flatbush, East Flatbush.  I can't

9    remember the third one.  Flatbush, East

10   Flatbush.  It's another neighborhood.  I can't

11   remember.  It might be Crown Heights.

12         Q.      What were the differences between

13   the units --

14              MS. POLIAS:   Withdrawn.

15         Q.      Were there any differences

16   between the functions of the units?

17         A.      No.

18         Q.      They all investigated allegations

19   of abuse and neglect against children; is that

20   correct?

21         A.      Yes, yes.

22         Q.      Did some of them investigate

23   certain types of allegations of abuse and

24   neglect against children that other units did

25   not investigate?

13

Rogers

1
2      A.      PD gets everything.

3      Q.      Okay.

4      A.      I mean, there are specialized

5  units, but PD gets everything because of the

6  overflow, so PD gets everything, but you have

7  your specialized units, yes.

8      Q.      What did PD stand for?

9      A.      Protective diagnostic.

10      Q.      Do you recall the names of the

11  child protective managers who were under your

12  supervision when you were in the Grant Square

13  office?

14      A.      Karen Sawyer, Marsha Goodluck.

15  I'm just trying to remember.  I move so much.

16  Marva, I can't remember her last name.  Marva,

17  Marsha, Karen, James Massey.

18      Q.      Okay.

19              How many protective diagnostic

20  units were there in the office?

21      A.      I said 12 before.

22      Q.      Okay.

23              I'm sorry, there was -- all of

24  the units were protective diagnostic?

25      A.      They're called protective

14

Rogers

2 diagnostic, but they still have a specialty.

3          Q.      Okay.

4                  Did anyone directly report to the

5 managers in the office?

6          A.      Yes.

7          Q.      Who directly reported to the

8 managers?

9          A.      Supervisors.

10          Q.      At the time in 2009, were there

11 Supervisor I's and Supervisor II's?

12          A.      A few.

13          Q.      But those two titles existed in

14 the office; is that correct?

15          A.      Yes.

16          Q.      Did the Supervisor I report to

17 the Supervisor II?

18          A.      Yes.

19          Q.      Who else reported to the

20 Supervisor II besides the Supervisor I?

21          A.      The caseworkers.

22          Q.      Back in 2009, how was your office

23 informed of allegations of abuse or neglect

24 involving children?

25          A.      My office?  I'm not sure what you

15

Rogers

1    mean by "my office."

2         Q.    I'm sorry, how was the -- when

3    you were the deputy director of operations of

4    the Grant Square office, how was the Grant

5    Square office informed about allegations of

6    abuse and neglect against children?

7         A.    Through the State Central

8    Registry.

9         Q.    Okay.

10        Are you familiar with the term

11   ORT?

12        A.    Yes.

13        Q.    What was an ORT back in 2009?

14        A.    I'm sorry?

15        Q.    Okay.

16        In 2009, what constituted an ORT?

17        A.    I'm not sure what you mean "what

18   constituted."

19        Q.    What is an ORT?

20        A.    It's a report, usually a report

21   of neglect or abuse that comes through the

22   State to the borough offices for

23   investigation.

24        Q.    Was the Grant Square office

16

Rogers

1
2       considered a borough office?

3       A.      Yes.

4       Q.      Are you familiar with the term

5       zone E?

6       A.      Yes.

7       Q.      Was that a geographical area in

8       Brooklyn?

9       A.      Yes.

10      Q.      Did the Grant Square office cover

11      that geographical area?

12      A.      Grant Square is zone E.

13      Q.      The allegations of abuse and

14      neglect came from the State Central Registry

15      in the form of an ORT; is that correct?

16      A.      Yes.

17      Q.      When you were in the Grant Square

18      office, who actually received the ORTs from

19      the State Central Registry?

20      A.      The applications unit.

21      Q.      Okay.

22              Did the Grant Square office have

23      its own applications unit?

24      A.      Yes.

25      Q.      Okay.

17

Rogers

1

2          What did the applications unit do

3     with the ORT after receiving it?

4          A.     They cleared it and made

5     assignments.

6          Q.     What do you mean by "cleared it"?

7          A.     Usually look at it for history,

8     to see if it's active, and then they assign it

9     to a particular unit.

10          Q.     Did each Supervisor II have one

11     unit that he or she supervised?

12          A.     Yes.

13          Q.     Was that also the case of

14     Supervisor I?

15          A.     Supervisor I reported to

16     Supervisor II of a unit.

17          Q.     Did a unit consist of a

18     Supervisor II, Supervisor I and caseworkers?

19          A.     Yes.

20          Q.     How many units did each manager

21     oversee in the office when you were in the

22     Grant Square office?

23          A.     It was between three to four.

24          Q.     How did the applications unit

25     assign it to a specific unit?

18

1                         Rogers

2        A.      It's based on rotation.

3        Q.      Okay.

4                Were there any other factors that

5   came into play besides doing it on a rotating

6   basis?

7        A.      Only if it was active with them

8   already.

9        Q.      Okay.

10               Back in 2009 when you were in the

11  Grant Square office, who actually in the unit

12  received the ORT from the applications unit?

13       A.      Either the supervisor or --

14  Supervisor II or the I.

15       Q.      What did the Supervisor II or I

16  do with the ORT after receiving it?

17       A.      They read it, reviewed it,

18  cleared it and made an assignment, gave

19  directives and had a conference -- conference

20  with the worker before going out in the field.

21       Q.      When you say that the supervisors

22  cleared it, what are you referring to with

23  regard to what they did?

24       A.      History, criminal history, ACS

25  history, ATS history and then assign it to a

19

1                           Rogers

2      worker and have a conference -- preconference.

3           Q.      Okay.

4                   What does ATS stand for?

5           A.      That's usually attendance from

6      the Board of Ed.

7           Q.      Okay.

8                   How did the Supervisor I or

9      Supervisor II assign the case to a caseworker?

10          A.      What do you mean?

11          Q.      Did the Supervisor I or

12     Supervisor II assign cases to caseworkers also

13     on a rotating basis?

14          A.      Yes.

15          Q.      Were there any other factors that

16     came into play that would cause the Supervisor

17     I or Supervisor II to deviate from doing it on

18     a rotating basis?

19          A.      Usually it's based on

20     availability.  Might be other things that come

21     into play.  I'm not sure.  Depends on the

22     supervisor.

23          Q.      Was the experience of the

24     individual caseworkers considered in what

25     cases to assign to each caseworker?

23

1                              Rogers

2           Q.      Since you have been at ACS, have

3     there been cases involving fatalities of

4     children?

5           A.      I'm sorry?

6           Q.      Since you've been working with

7     ACS are you aware of any cases where there --

8     where a fatality of a child has occurred?

9           A.      Yes.

10          Q.      Okay.

11                  When you were at the Grant Square

12    office -- according to your knowledge of ACS

13    policy and procedure while you were at the

14    Grant Square office, could a fatality be

15    assigned to a caseworker who had recently

16    begun?

17          A.      What's recent?

18          Q.      Like within the past year.

19          A.      Yes.

20          Q.      Okay.

21                  After the supervisors assigned

22    the cases to the caseworkers, what happened

23    from there when you were in the Grant Square

24    office?

25          A.      Practice is preconference, then

24

Rogers

1
2      the worker reviews the case, and sometimes the

3      workers do their own clearances so that

4      they're better informed before they go out in

5      the field.  Sometimes, you know, that's what

6      they do.  Then they will make phone calls to

7      the source so that they have more information,

8      and then they proceed to the field.

9          Q.    Okay.

10              When you were at the Grant Square

11     office, what kinds of things were discussed at

12     the preconference?

13         A.    I don't sit in on the

14     preconferences, so I'm not sure.

15         Q.    When you were at the Grant Square

16     office as deputy director of operations, what

17     role, if any, did you play in the actual

18     investigations?

19         A.    None.  Unless something is

20     brought to my attention, none.

21         Q.    Okay.

22              Did you do any supervision with

23     regard to the investigations?

24         A.    No.

25         Q.    Okay.

29

Rogers

1
2      staff and just plug staff into those

3      particular trainings or use the staff that we

4      had on board, like our clinical consultant

5      teams, you know, tap into resources we have

6      available for training needs.

7              Q.     Okay.

8                     Did you hold -- did you hold some

9      training sessions inside the office itself --

10             A.     Yes.

11             Q.     -- for staff?

12             A.     Yes.

13             Q.     Did your office occupy the entire

14     building or only certain parts of the

15     building?

16             A.     Two floors -- three floors.

17     Three floors.

18             Q.     Okay.

19                    Did you have an office manager

20     when you were in the Grant Square office?

21             A.     Yes.

22             Q.     What was the office manager

23     responsible for?

24             A.     Supplies, resources, facilities.

25             Q.     What role did the Supervisor II

30

Rogers

1
2      play in the investigations when you were in

3      the Grant Square office?

4             A.      The Supervisor II is the lead

5      person.

6             Q.      What were their specific

7      responsibilities or duties with regard to

8      investigations?

9             A.      Going back to the beginning,

10     clearing the case, reviewing the history,

11     providing guidance, basically giving the

12     worker the tools that they need to do the

13     investigation and supporting that worker

14     throughout the life of that investigation.

15            Q.      Okay.

16                    What were the responsibilities

17     and duties of the Supervisor I with regard to

18     the investigations when you were in the Grant

19     Square office?

20            A.      Sup I is usually a support to the

21     staff, to CPS when they're overwhelmed or need

22     help or the Sup II, support of the Sup II.

23            Q.      According to your understanding

24     back in 2009 when you were at the Grant Square

25     office, was it the policy at ACS for ACS

```
                                                    31
1                       Rogers
2    supervisors to document instructions that they
3    gave to the caseworkers with regard to
4    investigations?
5            A.      Yes.
6            Q.      Were they required to do that in
7    Connections?
8            A.      Yes.
9            Q.      When you were in the Grant Square
10   office, did ACS's policies and procedures
11   apply in your office?
12           A.      Yes.
13           Q.      Okay.
14                   I'm sorry, bear with me for a
15   moment.
16                   According to your understanding
17   back in 2009 while you were at the Grant
18   Square office, what were the caseworkers
19   required to document in Connections about
20   their investigations?
21           A.      I'm not understanding that.
22           Q.      Okay.
23                   What details about their
24   investigations were they required to document
25   in Connections when you were in the Grant
```

                                                              32
1                              Rogers

2    Square office?

3            A.      The workers are given a template,

4    a guide, in terms of certain questions to

5    answer, and then they're given guidance from

6    the supervisor or the managers, additional

7    support to that template that's in

8    Connections.

9            Q.      Okay.

10                   Do you recall what that template

11   is called?

12           A.      It's called template.

13           Q.      Okay.

14                   When you were in the Grant Square

15   office, as far as you know, were ACS

16   caseworkers able to make changes to their

17   entries in Connections after entering them?

18           A.      At a certain amount of days in,

19   it would freeze.

20           Q.      How many days did they have to

21   make changes?

22           A.      Then?  Now?  It might be 14 days,

23   12 to 14 days.  I believe it's 14 days and the

24   note freezes from draft to final.

25           Q.      Did supervisors have the same

38

Rogers

1

2  from school staff in getting the child to

3  speak to that ACS caseworker?

4          A.      Yes.

5          Q.      What types of assistance were

6  they able to get from school staff?

7          A.      It depends on the familiarity

8  with that staff member in the school and that

9  child.  If they're familiar with that child,

10  they're usually -- the child is much more

11  comfortable around that person, in terms of

12  speaking.

13          Q.      Were they permitted by ACS policy

14  to ask a member of the school staff to speak

15  to the child and ask the child specific

16  questions that ACS wanted answers to?

17          A.      They can.

18          Q.      I'm still talking about the same

19  time period in 2009 when you were at the Grant

20  Square office.  According to your

21  understanding, was it the policy for ACS

22  caseworkers to make observations of children's

23  bodies during an investigation?

24          A.      Yes.

25          Q.      What were they supposed to look

```
                                                            39
1                          Rogers
2        for?
3                A.      Marks, bruises.
4                Q.      Okay.
5                        When you say "marks," what
6        specific types of marks are you referring to?
7                A.      Any.
8                Q.      Any marks, okay.
9                        They were required to observe the
10       unclothed portions of the child's body for
11       these types of marks?
12                       MS. POLIAS:   Withdrawn.  I want
13            to rephrase it differently.
14               Q.      Were they required to observe the
15       unclothed portions of the child's body for
16       marks?
17               A.      Yes.
18               Q.      Were there any circumstances
19       under which the caseworkers were expected to
20       try to view the parts of the body that were
21       clothed by asking -- having the clothes
22       removed or lifted?
23               A.      You have to repeat that.
24               Q.      Okay.
25                       MS. POLIAS:   Can you read it
```

40

                            Rogers

1

2      back.

3                (Record read.)

4      A.       Yes.  As I said before, yes.

5      Q.       What circumstances were those?

6      A.       Any case.  Every case.

7      Q.       In every case the caseworker was

8      expected to try to have parts of the child's

9      clothing removed or lifted?

10     A.       Um-hmm.  We always assess for

11     marks and bruises.

12     Q.       Okay.

13              Under ACS policy at the time,

14     according to your understanding, what did the

15     caseworker have to do in order to have the

16     clothes of a child removed or lifted?

17     A.       They can usually ask.  They

18     usually ask, if there's a parent available,

19     can you lift the clothes, take off their

20     shirt, so I can observe the child for marks

21     and bruises.  Different circumstances -- if a

22     child is going to a hospital to be examined at

23     a hospital, they have the child's body checked

24     there, so it depends.

25     Q.       If the child was being observed

41

Rogers

1

2      in the home, did the ACS caseworker have to

3      ask the parents' permission in order to have

4      the clothes lifted or removed?

5              A.      We don't have to.

6              Q.      Okay.

7              A.      But if you're in the home, it's

8      respect.  You ask.

9              Q.      Okay.

10              Were there any circumstances

11      under which the ACS caseworkers were required

12      to get the parents' permission?

13              A.      If we're asking for a child to be

14      taken out of a home to a doctor, yes.

15              Q.      Okay.

16              A.      If there's not imminent safety

17      concerns.

18              Q.      When you say "if there's not

19      imminent safety concerns" --

20              A.      And the parent --

21              Q.      -- what would happen if there

22      were imminent safety concerns?

23              A.      And the parent was not will to

24      comply, then it becomes a removal, so I'm

25      saying if it's not a removal, we ask.

42

Rogers

1

2      Q.      It was the practice to ask if the

3   child wasn't in the process of being removed?

4      A.      Right.

5      Q.      Okay.

6              What was the caseworker supposed

7   to do, under your understanding of ACS policy,

8   if the parent said no, the child's clothes are

9   not going to be lifted or removed?

10     A.      Usually at that time they will

11  call back to the supervisor or the manager for

12  guidance.

13     Q.      Okay.

14             If a removal was not in the

15  process of taking place, could the ACS

16  caseworker not ask the parent for permission

17  but ask the child for permission?

18     A.      Yes.

19     Q.      Okay.

20             Are you saying that according to

21  your understanding it was practice to ask the

22  parents' permission before having clothes

23  lifted or removed, but it was not required to

24  ask the parents' permission before having

25  clothes lifted or removed?

```
                                                    43
 1                       Rogers
 2          A.      I'm saying -- yes, yes.
 3          Q.      All right.
 4                  According to your understanding
 5      of ACS policy at the time, were ACS
 6      caseworkers required to document the marks
 7      that they observed on the children's bodies?
 8          A.      Yes.
 9          Q.      Were they required to document
10      all marks?
11          A.      Yes.
12          Q.      What details about those marks
13      were they required to document?
14          A.      Each person documents different,
15      so I can't -- you know, everybody documents
16      different, so it's kind of hard to say what
17      are you required to document.  If you see
18      something, you document it --
19          Q.      Okay.
20          A.      -- so that's the practice.
21          Q.      In what way were they expected to
22      document it?  What about the marks were they
23      expected to document?
24          A.      I'm not sure what you mean.
25          Q.      Were they expected to document
```

45

1                         Rogers

2       documentations in Connections; is that

3       correct?

4               A.      Correct.

5               Q.      Okay.

6                       According to your understanding

7       at the time, 2009, when you were in the Grant

8       Square office, did ACS policy mandate that the

9       caseworkers try to take photos of children's

10      bodies under certain circumstances?

11              A.      Certain circumstances, yes.

12              Q.      What circumstances were those?

13              A.      Marks and bruises.  Unexplained

14      marks and bruises.

15              Q.      Okay.

16                      If the child explained where the

17      marks and bruises came from, were ACS

18      caseworkers still required to try to take

19      photos of those marks?

20              A.      Marks and bruises, yes.

21              Q.      Did ACS have a policy at the

22      time, according to your understanding, about

23      how the caseworkers were supposed to go about

24      actually doing the photographing?

25              A.      I'm not understanding that

```
                                                    46
 1                        Rogers
 2   question.
 3             Q.      Okay.  I will rephrase.
 4                     According to ACS policy --
 5                     MS. POLIAS:  Withdrawn.
 6             Q.      According to your understanding
 7   of ACS policy at the time did the caseworkers
 8   have to get consent or permission from the
 9   parent before photographing the child?
10             A.      If the parent was available, yes,
11   they can.
12             Q.      Okay.
13                     But they didn't have to; is that
14   correct?
15             A.      Correct.
16             Q.      Okay.
17                     When you were in the Grant Square
18   office in 2009, were there cameras available
19   in the office?
20             A.      Yes.
21             Q.      Okay.
22                     Where were those cameras kept in
23   the office?
24             A.      I believe they were with the
25   office manager.
```

47

Rogers

1

2      Q.      Okay.

3              Who was the office manager at the

4      time that you were the deputy director of

5      operations in the Grant Square office?

6      A.      I don't recall.

7      Q.      Okay.

8              Do you recall how many cameras

9      there were?

10     A.      I don't recall.

11     Q.      What were the purpose of having

12     those cameras in the office?

13     A.      For pictures of children that

14     were injured, marks and bruises, burns, to use

15     for the records.

16     Q.      What did the caseworker need to

17     do in order to be able to borrow a camera from

18     the office?

19     A.      Request it.

20     Q.      How did they request it?

21     A.      Verbal request it.

22     Q.      Did they have to fill out any

23     forms?

24     A.      I don't recall.

25     Q.      Did they have to request it a

48

Rogers

1

2    certain amount of time in advance?

3          A.     I don't recall that.

4          Q.     How were the caseworkers informed

5    that --

6                 MS. POLIAS:  Withdrawn.

7          Q.     How were the caseworkers that

8    were just coming into the office informed that

9    there were cameras available in the office for

10   them to use to document marks?

11         A.     Their supervisors.

12         Q.     Okay.

13                Was there a limit on the amount

14   of time that they could borrow the camera for?

15         A.     I'm not sure.  I doubt it.

16         Q.     Okay.

17                Do you know who might have the

18   information about the specifics about

19   borrowing cameras from the office?

20         A.     Well, usually the staff knows

21   because they're in and out of the office

22   manager's office.

23         Q.     Okay.

24                Was the office manager under your

25   supervision?

49
1                            Rogers
2            A.      No.
3            Q.      Whose supervision was the office
4     manager under?
5            A.      The deputy of admin.
6            Q.      Okay.
7                    Who was that person in the Grant
8     Square office when you were there?
9            A.      I don't recall who it was.  I'm
10    not sure.
11           Q.      Who did you report to when you
12    were in the Grant Square office?
13           A.      Jacqueline McKnight.
14           Q.      Okay.
15                   What title did Jacqueline
16    McKnight have at the time?
17           A.      Borough director, assistant
18    commissioner.
19           Q.      Did you report to anybody else
20    besides her?
21           A.      No.
22           Q.      In terms of hierarchy, did you
23    have the highest title in the Grant Square
24    office when you were there?
25           A.      Yes.

50

Rogers

1

2          Q.      Are you familiar with the term

3   safety assessment?

4          A.      Yes.

5          Q.      What is a safety assessment?

6          A.      It's a document that's required

7   by the State within seven days to speak to the

8   safety of a child or children in a home and

9   any interventions put in place.

10         Q.      Okay.

11                 When you were in the Grant Square

12  office in 2009, was that document also

13  required by the State at that time?

14         A.      Yes.

15         Q.      Okay.

16                 Could that document be filled out

17  on Connections?

18         A.      It's in Connections.

19         Q.      It's in Connections.

20                 With regard to investigation, who

21  was responsible, at the time when you were in

22  the Grant Square office, for completing that

23  document?

24         A.      The worker and the supervisor.

25         Q.      When you were in the Grant Square

51

Rogers

1

2    office in 2009, were there any other documents

3    in Connections that were sent to the State

4    besides the safety assessment from

5    Connections?

6            A.      It's not sent to the State.  It's

7    approved in Connections.  I don't -- no, I

8    don't recall any documents, but that's a State

9    document -- it's part of Connections that are

10   State and some are local, parts of

11   Connections, so the safety assessment, the

12   determination are both State documents.  The

13   other parts of Connections are local, City

14   documents.

15           Q.      Okay.

16                   I'm sorry, besides the safety

17   assessment did you say there was another

18   document --

19           A.      The investigation --

20           Q.      -- that was State?

21           A.      -- determination, those two are

22   State documents.

23           Q.      Okay.

24                   The State has access to those

25   documents --

52

1                          Rogers

2          A.       Right.

3          Q.       -- in Connections?

4          A.       Right, and the notes.

5          Q.       And the progress notes as well?

6          A.       Right.  Those are all the State,

7     right.

8          Q.       Okay.

9                   When you say "the State," are you

10    referring to the central register?

11         A.       OCFS.

12         Q.       That's Office of Children and

13    Family Services; is that correct?

14         A.       Correct.

15         Q.       Are you familiar with the term

16    safety decisions?

17         A.       Yes.

18         Q.       Okay.

19                  What is a -- what are safety

20    decisions?

21         A.       Decisions in terms of the

22    elements of -- in terms of how a child is

23    doing, if the child is safe or unsafe, the

24    vulnerability of the child, threat of harm of

25    the child and protective capacity of a child.

```
                                                        53
 1                           Rogers
 2          Q.      Were safety decisions in some way
 3    related to the safety assessment?
 4          A.      Safety decisions are included in
 5    the safety assessment.
 6          Q.      Okay.
 7                  At the time, what were -- what
 8    were the different outcomes of the safety
 9    assessment?
10                  MS. POLIAS:  Withdrawn.  I will
11          ask it a different way.  I'll go back to
12          that.
13          Q.      Are you familiar with the term
14    risk assessment profile?
15          A.      You mean the RAP?
16          Q.      Yes.
17          A.      Yes.
18          Q.      Was the RAP also in Connections?
19          A.      Yes.
20          Q.      What was the purpose of the RAP?
21          A.      It gives a rating in terms of --
22    you combine the history -- the prior history
23    with the current dynamics of a family to come
24    up with a rating in terms of risk.
25          Q.      Okay.
```

54

Rogers

1

2          What were the different possible

3     ratings for RAP when you were in the Grant

4     Square office?

5          A.     Low, moderate, high or very high.

6          Q.     What was the purpose of coming up

7     with a rating?

8          A.     You have to ask the State, but

9     basically it combines the family's history --

10    synthesizing the history to get an outcome in

11    terms of, you know, is it risk or is it safety

12    in terms of what should you be -- your

13    intervention or safety plan, so it helps to

14    lead the staff in terms of next steps.

15         Q.     Okay.

16         When you were in the Grant Square

17    office, what was the different between risk

18    and safety, as you understand it?

19         A.     Well, risk is more possibility,

20    looking at the possibility that this may

21    happen, whereas with safety we know that it is

22    occurring.  It can be, you know, impending or

23    immediate with safety.  Whereas with risk, you

24    know, there's a possibility of it going on to

25    safety, something could happen.

```
                                                          55
 1                          Rogers
 2          Q.      Okay.
 3                  What were the different possible
 4     outcomes in terms of intervention with regard
 5     to the risk assessment plan or the RAP?
 6          A.      I'm not understanding your
 7     question.
 8          Q.      Well, you indicated that the
 9     RAP -- the purpose of the RAP was to help you
10     to decide on an intervention; is that correct?
11          A.      Correct.
12          Q.      What were the possible
13     interventions?
14          A.      It could be services, in terms of
15     counseling, supportive services for the
16     family.  It could be tapping into resources
17     they already have, could be court, could be
18     removal.  It could be a whole slew of things
19     to help support the family.
20          Q.      Okay.
21                  What rating would be necessary on
22     the RAP in order to do a removal?
23          A.      Well, remember the RAP is not
24     necessarily done immediately.
25          Q.      Okay.
```

56

1                          Rogers

2          A.      So the RAP doesn't have to guide

3     the investigation, because things can happen

4     at the beginning as opposed to at the point of

5     the RAP.

6          Q.      Okay.

7                  When was the RAP supposed to be

8     done when you were in the Grant Square office?

9          A.      It can be done within the --

10    within 30 days or within 60 days, so it

11    doesn't usually lead the work.

12         Q.      Okay.

13                 Who was responsible for

14    completing the RAP?

15         A.      The worker.

16         Q.      Was that with the guidance of the

17    supervisor?

18         A.      Yes.

19         Q.      One of the interventions that the

20    RAP could lead to is a removal; is that

21    correct?

22         A.      Yes.

23         Q.      Okay.

24                 Was there a specific rating that

25    had to be assessed on the RAP in order to lead

57

Rogers

1
2    to a removal?

3         A.    The RAP doesn't lead the work.

4         Q.    Okay.

5         A.    Sometimes -- like I said, the RAP

6    doesn't lead the work, but it helps in terms

7    of looking at interventions, looking at

8    decisions and safety planning, but it doesn't

9    lead the work.

10        Q.    Okay.

11              There was not any specific rating

12   that was mandatory in order to have an -- have

13   the intervention of removal; is that correct?

14        A.    Correct, correct.

15        Q.    Okay.

16              In terms of the safety

17   assessment --

18              MS. POLIAS:   Withdrawn.

19        Q.    In terms of the safety decisions,

20   as part of the safety assessment, were those

21   used when you were in the Grant Square office

22   for assessing what intervention was

23   appropriate?

24        A.    In the safety assessment?

25        Q.    Yes.

```
                                                    58
 1                       Rogers
 2          A.      Yes.
 3          Q.      How many possible safety
 4   decisions were there?
 5          A.      I don't recall.  I don't do
 6   safety assessments.  I don't recall.
 7          Q.      Okay.
 8                  Were there any safety decisions
 9   that mandated the implementation of a removal?
10          A.      Can you repeat that.
11          Q.      Sure.
12                  As far as you're aware, as far as
13   you know, were there any safety decision
14   outcomes from the safety assessment that would
15   mandate ACS doing a removal?
16          A.      Yes.
17          Q.      What safety decisions were those?
18          A.      Usually you have -- I can't
19   remember the numbers.  You have impending or
20   immediate danger, and usually those would
21   trigger the removal for the staff -- for the
22   supervisor in terms of what was put into it
23   that triggered the immediate or impending
24   danger.
25          Q.      What was impending danger?
```

```
                                                    59
 1                       Rogers
 2        A.      It's a whole class of things I
 3   can give you.  You know, child in the
 4   hospital, serious injury, another child left
 5   in the home could be at risk because of the
 6   incident from the other child.  There's so
 7   much I could...
 8        Q.      Was there any difference between
 9   impending or immediate danger?
10        A.      Yes.  Impending I'm saying in
11   terms of another child, where the first child
12   is injured, and there's immediate danger for
13   first child, but it's impending for the second
14   child.
15        Q.      Okay.
16        A.      Immediate is that a child is
17   seriously injured by a parent, and that parent
18   is the primary caretaker for that child.
19        Q.      Okay.
20                When you were in the Grant Square
21   office, did you -- was there anything held
22   that was called family meetings?
23        A.      Yes.
24        Q.      Okay.
25                What was a family meeting?
```

```
                                                      65
 1                    Rogers
 2   Square office?
 3        A.      Yes.
 4        Q.      What was your understanding of
 5   what constituted corporal punishment when you
 6   were in the Grant Square office?
 7        A.      Beating a child excessively,
 8   leaving marks and bruises that required
 9   medical attention, sex abuse requiring a child
10   to need medical attention, abuse being
11   physical.
12        Q.      Okay.
13             At the time when you were in the
14   Grant Square office, according to your
15   understanding of ACS policy, was physical
16   abuse considered a safety concern?
17        A.      Yes.
18        Q.      Okay.
19             Was that all types of physical
20   abuse.
21        A.      Yes.
22        Q.      What was the type -- was that the
23   type of safety concern for which a child
24   safety conference would be held?
25        A.      I'm sorry?
```

67

Rogers

1
2 family and notify them that way or in person
3 notify them that way.
4     Q.    How much notice were they
5 required to give them?
6     A.    I don't know if there was a set
7 time.  If it's a safety concern, the notice is
8 very short.
9     Q.    Okay.
10          Do you know what the minimum
11 amount of time was?
12     A.    I don't think there is any.
13     Q.    Okay.
14          The safety conferences were held
15 in the office; is that correct?
16     A.    Sometimes off site.
17     Q.    Okay.
18          Where else off site might they be
19 held?
20     A.    Like a hospital or a community
21 place.
22     Q.    Were the caseworkers required to
23 tell the family that they could bring their
24 own representative to the child safety
25 conference?

68

Rogers

1

2       A.      What do you mean

3    "representative"?

4       Q.      Were the caseworkers required to

5    tell the family members that they could --

6    they could bring someone for support --

7       A.      Yes.

8       Q.      -- at the conference?

9       A.      Yes.

10      Q.      Okay.

11              Were they required to tell the

12   family who those people to provide support

13   would be?

14      A.      They would inform them they can

15   bring anyone they want except an attorney.

16      Q.      Why was an attorney not

17   permitted?

18      A.      Legal representation.  It was not

19   a legal forum.

20      Q.      What were the possible outcomes

21   for a child safety conference when you were in

22   the Grant Square office?

23      A.      No court, court, services,

24   continuing the service that may already be in

25   place, court, court-ordered supervision to

80

1                        Rogers

2    broken in some way, was that a circumstance

3    under which the caseworker would be required

4    to try to seek medical attention for the

5    child?

6          A.      It depends on what type of injury

7    it was.  It depends on the parents' protective

8    capacity, again.  Are they willing to take the

9    child to seek immediate medical care?  If it

10   warrants immediate medical care, it's

11   different.

12         Q.      Okay.

13                 Are you familiar with the term

14   immediate response team?

15         A.      IRT.

16         Q.      Does that stand for immediate

17   response team?

18         A.      Yes, ma'am.

19         Q.      Okay.

20                 What is an immediate response

21   team?

22         A.      Usually it's a joint

23   collaboration between the police department,

24   Safe Horizon and ACS.

25         Q.      What was the purpose of an

81

Rogers

1
2       immediate response team?

3              A.       Usually we jointly interview the

4       child to see if there's criminality, and

5       usually Safe Horizon does the medical

6       assessment and supportive counseling for the

7       family, so it's a joint, I guess, intervention

8       with all three disciplines in terms of making

9       sure that the child's needs are met with the

10      services afterwards as well, and the criminal

11      piece is included.

12             Q.       The police department is involved

13      as well?

14             A.       Um-hmm.

15             Q.       You have to verbally answer.

16             A.       I said yes, I'm sorry.

17             Q.       It's okay.

18                      Was that its function back in

19      2009 when you were in the Grant Square office?

20             A.       Yes.

21             Q.       During that time in 2009 under

22      what circumstances would an immediate response

23      team be involved?

24             A.       If certain criteria, in terms of

25      IRT -- a case being labeled an IRT, so they

82

Rogers

1
2    have certain criterias in terms of what
3    classifies a report for IRT.
4         Q.    Do you know what those criteria
5    are?
6         A.    Not all of them, no.
7         Q.    At what point in the
8    investigation would an immediate response team
9    become involved?
10        A.    At any stage of an investigation
11   it can be made an IRT.
12        Q.    Okay.
13             Could the caseworker call for an
14   immediate response team to be dispatched?
15        A.    No.  They call the IRT
16   coordinator.
17        Q.    Okay.
18             Where was the IRT coordinator
19   located when you were in the Grant Square
20   office?
21        A.    I believe there was one at Grant
22   Square.
23        Q.    Do you know who that person was?
24        A.    No.
25        Q.    The IRT coordinator would

83

Rogers

1

2     actually do the work to get -- to get the

3     immediate response team involved?

4          A.        Correct.

5          Q.        When you were the deputy director

6     of operations in the Grant Square office were

7     there any circumstances under which the ACS

8     caseworker or supervisor was required to call

9     the police?

10         A.        You said the supervisor?

11         Q.        Yes, the ACS caseworker or

12    supervisor.

13         A.        Sometimes, yes.

14         Q.        Like in what kinds of times?

15         A.        If they felt the worker is at

16    risk in the field, if there's something going

17    on in the office and they need police

18    intervention, they would call.

19         Q.        If they believe the child that

20    was the subject of their investigation was

21    being physically abused, were they required to

22    call the police?

23         A.        The contact the IRT coordinator,

24    make the report an IRT so that the police

25    would be involved with the investigation.

102

1                           Rogers

2        A.      Marks, bruises, it varies.

3        Q.      Did you receive any training or

4   instruction at any point on what a mark caused

5   by a belt buckle looks like?

6        A.      We have medical consultants.  We

7   consult usually with our medical consultants

8   or doctor to help us understand a mark because

9   we're not experts in that field, so we have

10  medical consultants on site, and we consult

11  usually with a doctor, an expert.

12       Q.      Okay.

13               Have you ever received yourself

14  any training in what a mark caused by a belt

15  buckle or belt strap would look like?

16       A.      Again, we usually consult with

17  the medical experts or someone who is an

18  expert in that field to help us understand

19  what that mark is and where it came from --

20  possibilities in terms of where it may come

21  from.

22       Q.      Under what circumstances would

23  you consult with a medical expert or

24  consultant?

25       A.      Usually if we're not sure, if the

103

1                          Rogers
2    explanation is not consistent with the injury
3    or we just need clarity in terms or what it
4    is, how serious it is, things like that, and
5    if it needs a medical follow up.
6            Q.      Okay.
7                    Are those the circumstances under
8    which you would seek a medical consultant or a
9    medical expert's assistance under ACS policy?
10           A.      That's just some of them.
11           Q.      Okay.
12                   Are these medical experts or
13   medical consultants employed by the City of
14   New York?
15           A.      Yes.
16           Q.      Do they actually work within ACS?
17           A.      Yes.
18           Q.      Where are they located?
19           A.      Different offices.  Each borough
20   has a certain amount at different sites.
21           Q.      Did you have any at your site in
22   Grant Square?
23           A.      She -- we shared one between
24   another site and our site.
25           Q.      What was her name?

104

1                          Rogers

2          A.        I don't recall.

3          Q.        Was she a physician?

4          A.        No, nurse practitioners.

5          Q.        When you were at the Grant Square

6    office, where were children who had just been

7    removed taken by the caseworkers?

8          A.        Usually to the nursery to see the

9    nurse to get a medical clearance.

10         Q.        Okay.

11                   Where was that nursery located?

12         A.        It's at 2554 Linden Boulevard.

13         Q.        Do you know a person by the name

14   of Geneva White who is a nurse?

15         A.        I don't know the nurse's name.

16         Q.        Is the location of 2554 Linden

17   Boulevard part of ACS?

18         A.        Yes, it is.

19         Q.        What did the caseworker do after

20   getting the medical clearance at 2554 Linden

21   Boulevard?

22         A.        The child goes to placement once

23   medically cleared.

24         Q.        Okay.

25                   Were there any facilities at that

131

1                            Rogers
2    punishment?
3         A.      We have determinations.  We have
4    definitions in terms of what's excessive,
5    what's this, what's that, but they're general
6    definitions, and, you know, we factor into
7    other things -- we factor other things into
8    our determinations before we make a
9    determination.
10        Q.      Do you know where those
11   definitions could be found?
12        A.      Everybody has a CPG, casework
13   practice guide.
14        Q.      Okay.
15               When you were in the Grant Square
16   office, according to your understanding did
17   ACS policy require caseworkers or supervisors
18   to speak to the nurse practitioner or consult
19   with the nurse practitioner about any marks
20   that they were concerned about?
21        A.      Can you repeat the beginning
22   part.
23        Q.      Sure.
24               MS. POLIAS:  Could you read it,
25        please.

132

1                           Rogers

2                   (Record read.)

3       A.        Yes.

4       Q.        Okay.

5                 Are you familiar with the term

6    indicating report?

7       A.        Yes.

8       Q.        What does that term mean?

9       A.        It means that basically the

10   worker made the determination that the

11   allegations were true.

12      Q.        Does that include the allegations

13   that may have been added to the allegation

14   list?

15      A.        Some could be indicated, and some

16   could be unfounded.   Depends.

17      Q.        Which allegations are you

18   referring to?

19      A.        Well, if you have more than one,

20   you could make a determination -- you make a

21   determination on each one.

22      Q.        Okay.

23      A.        It's not grouped in.   They're

24   individually -- you know, the determination is

25   based on each one of them, but an overall --