UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
JUNIOR WALKER and TAHERA BULLEN-
WALKER, on behalf of themselves and on
behalf of their infant children T.W. and N.W.,

**DECISION & ORDER**
12-CV-2535 (WFK) (MDG)

Plaintiffs,

*-against-*

THE CITY OF NEW YORK, STACEY ROBINSON,
Caseworker, New York City Administration of
Children's Services, in her individual and official
capacities, GLADYS WHITE, Supervisor,
New York City Administration of Children's Services,
in her individual and official capacities, JACQUELINE
MCKNIGHT, Assistant Commissioner-Brooklyn, New
York City Administration of Children's Services, in her
individual and official capacities, SHARON ROGERS,
Deputy Director for Brooklyn Field Office, Zone E, New
York City Administration of Children's Services, in her
individual and official capacities, BURTON LEWIS,
Supervisor, New York City Administration of Children's
Services, in his individual and official capacities, KAREN
SAWYER-BARRO, Supervisor, New York City
Administration of Children's Services, in her individual and
official capacities, NATARSKY LOUISSAINT,
Caseworker, New York City Administration of Children's
Services, in her individual and official capacities, and JOHN
MATTINGLY, former Commissioner of the New York
City Administration of Children's Services, in his individual
and official capacities,

Defendants.

-------------------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**

Two parents bring this suit against numerous employees of the Administration of Children's
Services ("ACS"), the former ACS Commissioner, and the City of New York. Based on the
events surrounding the removal of their two infant children in 2009, the parents, Plaintiffs Junior
Walker and Thaera Bullen-Walker,[1] allege thirty-seven causes of action against the city and the

---

[1] For clarity, the Court notes that Plaintiff Junior Walker is referred to as "Walker" throughout
this Opinion, while Plaintiff Thaera Bullen-Walker is referred to as "Bullen-Walker."

eight individual defendants, all of whom are sued in both their individual and official capacities. Plaintiffs allege that Defendants violated their substantive and procedural due process rights, retaliated against Plaintiff Walker for exercising his First Amendment rights, unlawfully seized the infant children in violation of the Fourth Amendment, and engaged in malicious prosecution and abuse of process during the Family Court proceedings. However, Plaintiffs have failed to establish sufficient personal involvement for the majority of the individual Defendants. Furthermore, Plaintiffs have failed to establish a *Monell* claim against the City of New York or Commissioner Mattingly. The remaining Defendants are entitled to qualified immunity because caseworkers of reasonable competence could disagree as to whether the Family Court proceedings, under these circumstances, should have been pursued. For these reasons and others explained below, Defendants' motion for summary judgment is granted in its entirety.

## FACTUAL AND PROCEDURAL HISTORY

### I.      Parties

Plaintiffs Walker and Bullen-Walker bring this civil rights action on behalf of themselves and their infant children, T.W. and N.W. At the time of the relevant events, T.W. was eight years old and N.W. was one year old. Dkt. 93 (Third Am. Compl. ("Compl.")) ¶ 13. At that time, T.W. and N.W. lived in the custody of their father, Walker, and their maternal aunt, a non-party to this action.[2] *Id.* Bullen-Walker was stationed overseas with the United States military. *Id.*

The Defendants include: Stacey Robinson, a Child Protective Specialist ("CPS") at ACS; Gladys White, Robinson's CPS supervisor; Karen Sawyer-Barro, an ACS Child Protective Manager; Sharon Rogers, Deputy Director of Operations for an ACS Brooklyn Field Office; Jacqueline McKnight, Assistant Commissioner of ACS in Brooklyn in 2010; Natarsky Louissaint, an ACS caseworker; Burton Lewis, a supervisor at the Emergency Children's Services ("ECS") Division at ACS; and John Mattingly, the ACS Commissioner at the time of the events in question. Dkt. 72 (Defendants' R. 56.1 St. ("Defs.' St.")) ¶¶ 1–9. The Defendants were all named in their individual and official capacities. The City of New York is also named

---

[2] The aunt's name is not included in the Third Amended Complaint, the parties' Joint Pre-Trial Order, or Plaintiff's Rule 56.1 Statement. In fact, it appears that the aunt's name is not in the record.

as a Defendant under the *Monell* theory of municipal liability.

## II. Facts

The events recounted below are undisputed, except whereas noted.

On March 19, 2009, T.W. went to school with scratches on his face and informed a school official that his aunt had scratched him that morning. Defs.' St. ¶¶ 10–11. The allegations were sent to ACS. *Id.* ¶ 12. That evening, ACS caseworkers Defendant Louissaint and non-party Tavaria Robertson went to the Walker home. *Id.* ¶ 13. The caseworkers first interviewed Walker, as T.W.'s aunt was not home, and then attempted to interview T.W. *Id.* ¶¶ 14–15. When the caseworkers told Walker that it would be best to interview T.W. alone, Walker interrupted the interview moments into the proceedings. Dkt. 71-2 (Pierre Decl., Ex. S, Investigation Progress Notes ("IPN")) at 2. T.W. stopped speaking with the caseworkers once his father returned to the room. *Id.* Walker asked why the conversation had stopped and the caseworkers repeated that it would be best if T.W. was interviewed alone, which led to Walker becoming angry and yelling.[3] *Id.* The caseworkers ended the interview at this point. *Id.*

Defendant Robinson was then assigned to the case. She visited the Walker home on March 25, 2009 and spoke with both Walker and the aunt. Defs.' St. ¶ 18. The aunt admitted that she caused T.W.'s scratches, but said that it was a mistake and that she had apologized to T.W. immediately. IPN at 6. The next day, Robinson went to T.W.'s school and interviewed T.W. and the school's staff. Defs.' St. ¶ 19. T.W.'s remedial studies teacher indicated that

---

[3] Plaintiffs deny both that Walker interrupted T.W's interview and that he became angry or began yelling during the caseworkers' interview. Dkt. 75 (Pls.' Opp. to Defs.' R. 56.1 St. ("Pl.'s Opp. St.")) ¶¶ 15–16 (citing Dkt. 74-29 (Polias Aff, Ex. 27, Walker Dep. ("Walker Dep.")) at 19–20). However, the excerpt of the Walker deposition cited to includes no discussion of the initial visit by the caseworkers. *See* Walker Dep. Accordingly, Defendants' factual representation is not genuinely disputed. The Court therefore deems Defendants' facts in Defs.' St. ¶¶ 15–16 admitted for purposes of summary judgment.

Walker was "in denial about T.W.'s limitations," but also said that she had never observed T.W. to be abused or maltreated. IPN at 7.

Robinson then interviewed T.W., who told her that "he ha[d] suffered several beatings with a belt from his father, his biological mother and his aunt in the past." *Id.* at 8.[4] T.W. said that the last time that he received a beating from his aunt was in December 2008. *Id.* T.W. also presented marks on his body that he attributed to a beating from his aunt, though Robinson noted in her report that the marks were "not evident of beatings," in her opinion. *Id.* T.W. also told Robinson that "his father had given his 1 year old brother a beating with a belt leaving bruises to [N.W.'s] body." *Id.* However, Robinson noted that she had not observed bruises on N.W.'s clothed body. *Id.* T.W. went on to discuss arguments in the home, recount an incident where the aunt threw bleach in her husband's face, and an incident where T.W. received a beating from his aunt's brother. *Id.*

At the direction of Defendant White, Robinson arranged a family meeting to discuss the scratching incident, prior reports of domestic abuse, and offer potential support for the children. Defs.' St. ¶¶ 23-24. According to Robinson, Walker screamed and repeatedly hung up the phone when Robinson attempted to arrange the meeting. *Id.* ¶ 25. Walker refused to confirm the

---

[4] Plaintiffs have "den[ied] knowledge or information sufficient to be able to admit or deny the contentions" for the majority of facts asserted about the interview between Robinson and T.W. on March 26. *See* Pls.' Opp. St. ¶¶ 19–21. However, this response is insufficient to refute a properly asserted fact by Defendants. *See* Local Rule 56.1(c) (each paragraph in a Rule 56.1 St. "will be deemed to be admitted unless specifically controverted"). Merely stating that Plaintiffs have insufficient knowledge or information does not specially controvert a fact. *See Alfano v. NGHT, Inc.*, 623 F. Supp. 2d 355, 363 (E.D.N.Y. 2009) (Gershon, J.) (merely denying information or knowledge sufficient to form a belief "is not sufficient to create an issue of fact for Rule 56 purposes"); *Aztar Corp. v. NY Entm't, LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y. 1998) (Glasser, J.) *aff'd sub nom.*, 210 F.3d 354 (2d Cir. 2000) ("Defendants have not created any issues of fact through [the] artifice" of denying knowledge or information sufficient to deny a fact.). Accordingly, facts asserted by Defendants that were met with this reply are deemed admitted by this Court for purposes of these summary judgment motions.

meeting times and did not appear at the meeting. *Id.* ¶ 26.[5]  Robinson and White attempted to

hold the family meeting at the Walker home during an unannounced visit, but no one answered

the door. *Id.* ¶ 27.

Plaintiffs deny Defendants' version of the facts and contend that Walker "did not want to

attend a meeting because Robinson did not seem interested in investigating the facts and learning

the truth[.]" Pl.'s Opp. St. ¶ 25. Plaintiffs contend that Robinson was attempting to goad Walker

into lying about the aunt's abuse of T.W. *Id.* However, Plaintiffs admit that Walker told

Robinson on the phone that "if she said one more word [about T.W. being abused], he would

throw her out of the house because she was not looking at his son's interest or the facts." *Id.*

Robinson visited T.W. at school for a second time on April 28, 2009. Defs.' St. ¶ 28.

"Upon seeing [Robinson], T.W. became terrified, stating that [his father] would beat him if he

discovered that [T.W.] had spoken to [ACS]." *Id.* ¶ 29.  T.W. claimed to Robinson that the

family had been home during the attempted family meeting, but had intentionally refused to let

the ACS caseworkers in. *Id.* ¶ 30.

After these events, White and Robinson decided to hold a child safety conference. *Id.* ¶

31. Plaintiffs contend that Defendants decided to hold this conference because "they wanted to

start an Article 10 proceeding against [Walker] and pursue a removal of the children based on

lies in order to retaliate against [Walker] for the exercise of his First Amendment right to

freedom of speech." Pls.' Opp. St. ¶ 31. Defendants state that they invited Walker to this

conference by U.S. mail, which is undisputed, however, Plaintiffs deny that Robinson called

Walker on his home and mobile phones to inform him of the conference. Defs.' St. ¶ 33.

---

[5] Plaintiffs deny the factual contentions in Defs.' St. ¶ 26 by reference to their statements in Pls.' Opp. St. ¶ 25. *See* Pls.' Opp. St. ¶ 26. However, Plaintiffs' contravening allegations are unrelated to whether Walker confirmed meeting times or appeared for a family meeting. *Id.* ¶ 25. Accordingly, the Court deems the facts in Defs.' St. ¶ 26 admitted.

Nonetheless, it is undisputed that neither Walker nor any other family member appeared at the child safety conference on April 30, 2009, *id.* ¶ 34, though Plaintiffs contend that Walker was not notified in time, Pls.' Opp. St. ¶ 34.

The participants at the conference, White, Robinson, and non-party Dina Barkin, concluded that the proper course of action to ensure that the children's safety was to file a New York State Family Court Act Article 10 petition seeking a remand order against Walker and the aunt. IPN at 15–16; Defs.' St. ¶ 35. Defendants argue that they made this decision based on T.W.'s accusations of excessive corporal punishment, his stated fear of being beaten for talking to ACS caseworkers, prior allegations of domestic incidents involving the aunt, and Walker's "refusal to engage at the most basic level with ACS inquiries[.]" Defs.' St. ¶ 35. Plaintiffs deny that these were the reasons that Defendants sought the petition, citing their belief that the petition was sought in retaliation against Walker. Pls.' Opp. St. ¶ 31, 35. In particular, Plaintiffs allege that "Robinson clearly did not like [Walker's] protests or his behavior toward her." *Id.* ¶ 31.

On April 30, 2009, the Kings County Family Court issued a remand order based on ACS's evidence. Defs.' St. ¶ 36. T.W. and N.W. were removed from the Walker home[6] in the early morning of May 1, 2009 and temporarily placed in the care of a paternal aunt. *Id.* Civil petitions against Walker and the aunt were also filed alleging neglect of the boys. *Id.* ¶ 37. An initial conference was held on May 5, 2009, during which Walker requested a New York State Family Court Law § 1028[7] hearing for the return of his children. *Id.* ¶ 38.

---

[6] According to ACS files, during the removal of the children, Walker refused to open the door, screamed at staff, told the officers they would need to break down the door to gain entry, and told the officers they did not have the right to come into his home. IPN at 16.

[7] N.Y. Family Court Law § 1028(a) provides in relevant part that upon a hearing, "the court shall grant [a parent's application to have a child returned], unless it finds that the return presents an imminent risk to the child's life or health."

The § 1028 hearing was held on May 6–7, 2009 before the Honorable Bryanne Hamill. *Id.* ¶ 40. At the hearing, both Plaintiffs and the children were represented by counsel. *Id.* At the end of ACS's presentation, which Plaintiffs' contend was built on Robinson's perjury, Judge Hamill found that ACS had rebutted Walker's *prima facie* entitlement to the return of his children. *Id.* ¶ 41; Pls.' Opp. St. ¶ 41. The next day, Judge Hamill conducted an *in camera* interview and examination of T.W., on consent of all parties and outside the presence of everyone except for T.W.'s legal guardian. Defs.' St. ¶ 42. Walker then formally withdrew his § 1028 petition, before Judge Hamill found on the record that "this is a child that in this Court's opinion has been beaten" and that T.W. "is afraid of his father." *Id.* ¶¶ 43- 44. Judge Hamill restricted Walker's visitation rights, which led to Walker leaving the courtroom. *Id.* ¶¶ 45–46. In response, Judge Hamill further restricted Walker's visitation rights and issued a temporary order of protection, which Walker did not appeal. *Id.* ¶¶ 46–47.

In 2010, following Walker's filing of a petition for administrative review, the New York State Central Registry ("SCR") reviewed ACS's files and amended the status of the alleged neglect by Walker from its initial finding of "indicated" to "unsubstantiated." *Id.* ¶ 48. Walker then moved to dismiss the Kings County Family Court neglect proceeding, but the Honorable Emily M. Olshansky denied the motion. *Id.* ¶ 49. On May 17, 2011, after summary judgment motions had been briefed and the fact-finding process concluded, Judge Olshansky issued a ruling from the bench that Walker had neglected the children. *Id.* ¶ 50.

Walker subsequently spoke to a member of Judge Olshansky's staff and informed her that he was going to appeal the judge's decision because Judge Olshansky was "not above the law." *Id.* ¶ 51. On June 13, 2011 Judge Olshansky issued a written decision reversing her bench ruling and holding that the evidence was insufficient for a finding of neglect against Walker. *Id.*

¶ 52. This was the first time in the entirety of the Family Court proceedings that any judicial officer made such a finding.

## III. Procedural History

Plaintiffs filed their initial federal civil rights complaint in this Court on May 18, 2012, and have since amended the complaint three times. Dkts. 1, 93. While Plaintiffs allege thirty-seven causes of action, there are five core constitutional violations as well as state law claims for malicious prosecution and abuse of process. Plaintiffs allege that Defendants: (1) violated their substantive and (2) procedural due process rights in initiating and during the removal proceedings; (3) retaliated against Walker for exercising his First Amendment rights; (4) unlawfully seized T.W. and N.W., and; (5) maliciously prosecuted and/or abused the state court process in bringing the Article 10 petition against Plaintiffs.

On June 13, 2014, the parties filed dueling motions for summary judgment. Dkts. 69, 79.[8] By stipulation, the summary judgment motions were deemed to apply to the Third Amended Complaint. *See* Dkt. 94. Trial in this action is set to commence on March 2, 2015.

## LEGAL STANDARD

A court appropriately grants summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The moving party must meet its burden by pointing to

---

[8] While Defendants have styled their motion as either a motion for summary judgment or a motion for judgment on the pleadings, the Court has considered evidence outside of the pleadings in deciding this motion. Therefore, both pending motions have been construed under the applicable standards for summary judgment.

evidence in the record, including depositions, documents, affidavits, or other materials which it believes demonstrates the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In determining whether summary judgment is appropriate, [the] Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted). The role of the district court is not to weigh the evidence and determine the truth of the matter, but rather to perform "the threshold inquiry of whether there is the need for a trial[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

If the moving party fulfills its preliminary burden, the burden shifts to the non-movant to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1). The non-moving party must make a showing sufficient to establish the existence of each element constituting its case. *See Celotex*, 477 U.S. at 322–23 ("[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."). Statements that are devoid of specifics and evidence that is "merely colorable" are insufficient to defeat a properly supported motion for summary judgment. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citing *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

## ANALYSIS

### A. Plaintiffs Cannot Establish the Personal Involvement of Most Individual Defendants

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in

the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d

Cir. 2013); *see also Hernandez v. Kane*, 341 F.3d 137, 144–45 (2d Cir. 2003). In *Colon v.*

*Coughlin*, the Second Circuit articulated five avenues through which a defendant may be shown

to have been personally involved in a constitutional violation:

> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of such a
> policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference . . . by failing to act on information indicating that
> unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995). [9] In other words, "supervisor liability in a § 1983 action depends

on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez*,

341 F.3d at 144.

Here, the undisputed facts establish that Defendants Sawyer-Barro, Rogers, McKnight,

Louissaint, Lewis, and Mattingly (1) were not personally involved in the decision to imitate the

Article 10 proceedings, (2) did not fail to remedy any wrong of which they were made aware of by

report or appeal, (3) did not create a policy or custom of unconstitutional practices, (4) were not

grossly negligent, and (5) did not exhibit deliberate indifference. Even if any of these defendants

had participated in the decision to file Article 10 proceedings, that alone is insufficient to establish

personal involvement. *See Shapiro v. Kronfeld*, 00-CV-6286, 2004 WL 2698889, at *20

(S.D.N.Y. Nov. 24, 2004) (Sweet, J.) (dismissing § 1983 claims against ACS supervisor and case

---

[9] This Court holds that absent any contrary directive from the Second Circuit, all five *Colon* factors survive the Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). *See Cano v. City of New York*, --- F. Supp. 3d ----, 2014 WL 4494169, at *10 (E.D.N.Y. Sept. 12, 2014) (Kuntz, J.) (citing *Hogan v. Fischer*, 738 F.3d 509, 519 n. 3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.")).

manager who were involved in filing of Article 10 proceedings, but did not make the removal determinations). Further, the receipt of a letter from Walker's attorney by Rogers and McKnight in June 2010 recounting the case and asking them to investigate, *see* Pls.' Opp. St. ¶ 5, is insufficient to establish personal involvement, *see Shapiro*, 2004 WL 2698889, at \*20 (receipt of a letter from Public Advocate regarding a caseworker's conduct did not create personal involvement on the part of a supervisory defendant). Lastly, Plaintiffs have not sufficiently disputed Defendants' asserted facts regarding the lack of personal involvement of McKnight, Louissaint, Lewis, and Mattingly. *See* n. 4 *supra* (discussing that denying knowledge or information sufficient to admit or deny a fact in R. 56.1 Statement does not controvert that fact).

The Court finds Plaintiffs' additional arguments regarding the policies and practices of ACS employees to be without merit. *See Richards v. City of New York*, 433 F. Supp. 2d 404, 428 (S.D.N.Y. 2006) (Mukasey, J.) ("Plaintiffs provide no evidence that [the ACS Commissioner] participated in any constitutional violation, was informed of any of the wrongs alleged by plaintiffs, created or allowed a policy or custom amounting to a constitutional violation, negligently supervised his subordinates, or failed to act on information indicating that unconstitutional acts were occurring.").

Accordingly, the claims against Defendants Sawyer-Barro, Rogers, McKnight, Louissaint, Lewis, and Mattingly in their individual capacities are dismissed for lack of personal involvement in the purported constitutional violations.

## B. Plaintiffs Have Failed to Establish Municipal Liability

A municipality also cannot be held liable under Section 1983 on a *respondeat superior* theory. *See Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Nonetheless, a municipality may be held liable if the purported unconstitutional conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted

and promulgated by [the municipal] officers . . . [or] governmental 'custom' even though such a custom has not received formal approval through the [municipality's] official decisionmaking channels." *Id.* at 690.

> To establish the existence of a municipal policy or custom, a plaintiff must allege: (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees.

*Bliven v. Hunt*, 478 F. Supp. 2d 332, 336-37 (E.D.N.Y. 2007) (Feuerstein, J.) *aff'd*, 579 F.3d 204 (2d Cir. 2009). Suits against municipal officials in their official capacity are subject to the same analysis. *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012). Typically, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

In the Third Amended Complaint, Plaintiffs advance only one theory of municipal liability: failure-to-supervise. Compl. ¶ 151. To state a failure-to-supervise claim, "[p]laintiffs are required to submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). Even if Plaintiffs adequately prove that certain ACS employees did not follow proper procedures, the City cannot be held liable under Section 1983 "if one of its employees applied an otherwise appropriate

policy in an unconstitutional manner." *Phelan v. Torres*, 843 F. Supp. 2d 259, 276 (E.D.N.Y. 2011) (Korman, J.) *aff'd sub nom.*, 512 F. App'x 88 (2d Cir. 2013) (internal quotations omitted) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989)). "At later stages of litigation, a plaintiff must establish also that defendant breached its duty to act by failing to make meaningful efforts to address the risk of harm to plaintiffs." *Id.* (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129–30 & n.10 (2d Cir. 2004)). When there is only one instance of the particular constitutional violation alleged by a plaintiff, it will ordinarily be insufficient to state a failure to supervise claim. *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (applying failure-to-supervise standards to a failure-to-train claim and holding that when there was no previous instance of the particular alleged constitutional violation raised to city officials, there was no *Monell* liability); *Phelan*, 843 F. Supp. 2d at 276 (finding no basis for *Monell* liability when plaintiffs failed to adduce evidence that defendant agency's policies and procedures were deliberately indifferent to a plaintiff's constitutional rights, even if one of the agency's actors on one occasion violated the plaintiff's rights); *Anderson v. City of New York*, 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987) (Leisure, J.) ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights."). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (Plurality Opinion of Rehnquist, J.); *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) (Sweet, J.) (collecting cases).

Here, the undisputed facts establish that, at most, the alleged unconstitutional conduct was limited to the actions of Defendants Robinson and White in these particular Family Court proceedings. *See Sec. A. supra.* Plaintiffs have not identified any additional, similar examples of

unconstitutional practices beyond the events they complain of here: two caseworkers allegedly being given free rein to allegedly fabricate information and pursue removal in retaliation for a parent's exercise of his First Amendment rights. *See* Dkt. 76 ("Pls.' Opp. Br.") at 19. The failure to identify any such example is fatal to Plaintiffs' failure-to-supervise claim. *See Connick*, 131 S. Ct. at 1360; *Phelan*, 843 F. Supp. 2d at 276; *Anderson*, 657 F. Supp. 1571, 1574.

Accordingly, Plaintiffs' claims against the City of New York and Defendant Mattingly in his official capacity are dismissed.

### C. Defendants Robinson and White Are Entitled to Qualified Immunity

#### 1) *Caseworker Qualified Immunity*

"Immunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Furthermore, "summary judgment should . . . be 'readily available to . . . [protective services] caseworkers in proper cases under the qualified immunity doctrine.'" *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999)). Individual government actors performing discretionary tasks are entitled to qualified immunity if: "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999) (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir. 1998)).

It is axiomatic that a caseworker seeking the protection of qualified immunity cannot have utilized perjury and intentional fabrications during her investigation and in presenting a case to the Family Court. *Green ex rel. T.C. v. Mattingly*, 07-CV-1790, 2010 WL 3824119, at *9 (E.D.N.Y. Sept. 23, 2010) (Vitaliano, J.). "The question for the Court, then, is whether [a defendant's] alleged misrepresentations were sufficiently material and serious to render the removal process constitutionally defective." *Id.* (finding the use of an allegedly "completely

fabricated" report was sufficient to defeat qualified immunity on a caseworker's motion to dismiss). The Second Circuit has held that "sins of commission and omission in what [caseworkers] told and failed to tell [a] Family Court Judge" are insufficient to overcome the "necessary freedom of action that qualified immunity accords caseworker defendants" dealing with evolving and dangerous domestic abuse situations. *Cornejo*, 592 F.3d at 128 (quoting, in part, *van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990)).

The Circuit has also recognized the particular challenges facing the caseworkers on the frontlines of domestic abuse:

> [P]rotective services caseworkers [must] choose between difficult alternatives . . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Tenenbaum*, 193 F.3d at 596 (quoting *van Emrik*, 911 F.2d at 866) (internal quotation marks omitted). Accordingly, "[i]n the context of child abuse or neglect proceedings, the Second Circuit has applied a deferential standard, emphasizing that 'courts must apply the 'reasonable basis' test to permit investigators considerable discretion in the abuse context.'" *Shapiro*, 2004 WL 2698889, at *19 (quoting *Wilkinson*, 182 F.3d at 106). The standard applies to both neglect and abuse cases. *Phifer v. City of New York*, 289 F.3d 49, 61 (2d Cir. 2002).

### 2) *Defendants' Reasonableness*

Here, Defendants argue that "based on the statements that T.W. made to Robinson, the subsequent corroboration of Robinson's concerns by Judge Hamill at the 1028 hearing, the decision not to dismiss the case against Walker by Judge Olshansky, and the ultimately self-reversed finding of fact against Walker, it is manifestly clear that 'case[]workers of reasonable competence could

disagree' as to the actions taken in this case.'" Defs.' Br. at 22 (formal titles omitted). Furthermore, Defendants contend that the initial decision to initiate the Article 10 proceeding was objectively reasonable based on: T.W.'s accusations of excessive corporal punishment toward him and N.W., T.W.'s stated fear of being beaten for talking to ACS caseworkers, prior allegations of domestic incidents involving the aunt, and Walker's "refusal to engage at the most basic level with ACS inquiries[,]" including his failure to offer any explanation for the marks on T.W. or the source of his son's allegations. Defs.' St. ¶ 35. Although Plaintiffs attempt to impute ulterior motives to Defendants for initiating these proceedings, qualified inquiry turns on the objective reasonableness of the Defendants' actions, and the Court finds their decisions were patently reasonable. *See, e.g., Dietz v. Damas*, 948 F. Supp. 198, 203 (E.D.N.Y. 1996) (Trager, J.) (quoting *van Emrik*, 911 F.2d at 866) ("The issue is whether it was objectively reasonable for the defendants to make the decision they made, and no rational jury could find that it was not."). The subsequent judicial proceedings in this action—which on three occasions resulted in a finding of neglect—confirm that "caseworkers of reasonable competence could disagree" as to whether abuse and/or neglect was taking place at the Walker home. *See V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010).

### 3) *Plaintiffs' Challenges*

Plaintiffs chiefly respond by arguing that qualified immunity cannot apply where the Defendants committed perjury or fabricated evidence in pursuing removal. In their papers, Plaintiffs repeatedly label Robinson and White's testimony as fabricated and perjured. Plaintiffs' use of such indicting terminology is jarring; however it is meaningless because it is unsupported by the record.

This Court is certainly conscious that qualified immunity is improper in light of credible evidence of material perjury or fabricated evidence. *See Brown v. City of New York*, No. 08-CV-5095, 2013 WL 1338785, at *6 (E.D.N.Y. Apr. 1, 2013) (Block, J.) (finding qualified immunity

improper when defendants allegedly made false statements to other officers and prosecutors, and where a second defendant was aware of the false statements, but did not intercede); *Green*, 2010 WL 3824119, at *9 (collecting cases); *Babi–Ali v. City of New York*, 979 F. Supp. 268, 275 (S.D.N.Y. 1997) (Batts, J.) (finding, on a motion to dismiss, that qualified immunity does not protect defendants who allegedly falsified records and committed perjury). However, the Court has thoroughly reviewed all of Plaintiffs' alleged examples of perjury and fabricated evidence. *See* Pls.' Opp. Br. at 5–17. And not one of those allegations presented an example of the sort of "extreme misstatement" necessary "to override . . . the freedom of action that qualified immunity accords caseworker defendants." *Cornejo*, 592 F.3d at 129 (finding that failure on the part of caseworker to provide exculpatory information regarding one parent's absence during the time of the alleged abusive incident to Family Court did not prevent qualified immunity); *Green*, 2010 WL 3824119, at *9–10 (requiring a misrepresentation be material, *i.e.* fabricating an entire report, to overcome qualified immunity on behalf of a caseworker defendant).

In general, Plaintiffs' response to Defendants' summary judgment motion has been to re-litigate the Family Court proceedings by raising issues properly suited for cross-examination in those proceedings, not for finding a constitutional violation in subsequent Section 1983 litigation in federal court. Plaintiff also vacillates between arguing that the ACS caseworkers and the Family Court itself were overly vigorous, and that they were utterly incompetent in their handling of the abuse allegations. Here, the Court limits its discussion to the non-frivolous examples raised in Plaintiffs' papers.[10] These allegations are addressed in turn.

---

[10] As an initial matter, the content and nature of the statements made by T.W. to Robinson during the two in-school interviews have been deemed admitted. *See* n. 4 *supra*. Therefore, Plaintiffs' assertions that Robinson committed perjury when she recounted T.W.'s statements during her testimony to the Family Court are baseless.

❖ **During the in-home interview by Louissaint and Robertson, T.W. did not allege being beaten, but neither Robinson nor White raised this to the Family Court. Pls.' Opp. Br. at 9–10.**

The fact that T.W. did not disclose that he was beaten during the at-home interview while Walker, the alleged aggressor, was in the adjoining room does not constitute perjury or fabrication on the part of Robinson or White. There are numerous reasons why T.W. would not have stated that he was being beaten during that time. The most obvious reason—his fear of Walker overhearing him and retaliating against him—is bolstered by T.W.'s subsequent statements that he would be beaten if his father knew he talked to ACS caseworkers. Furthermore, the Court has found that Walker interrupted the caseworkers' interview, preventing T.W. from having a safe and complete opportunity to speak. *See* n. 3 *supra*. And, even ignoring these probable explanations, Robinson and White's failure to raise this fact to the Family Court is, at best, a failure to raise an inconsequential exculpatory fact that does not undermine the availability of qualified immunity. *See Cornejo*, 592 F.3d at 128–29; *see also Muhammad*, 595 F.3d at 431 (finding qualified immunity for all city defendants despite that a relevant exculpatory fact regarding custody at the time of injury was not raised to the Family Court); *van Emrik*, 911 F.2d at 866 (2d Cir. 1990) (finding no constitutional violation where caseworkers failed to inform Family Court judge of exculpatory fact that the parents could not explain the cause of the injury because that the child was with a babysitter at the time of the injury).

❖ **Robinson recounted T.W.'s statement that Walker hit N.W. with a belt even though Robinson saw no evidence to support that assertion. Pls.' Opp. Br. at 10–11.**

Robinson's failure to corroborate T.W.'s statement that Walker hit N.W. with a belt does not undermine the availability of qualified immunity. Robinson had ample evidence supporting such a theory based on T.W.'s statements about the beatings that he personally received from Walker, the existence of marks on T.W.'s body, and T.W.'s subsequent refusal to speak with ACS

caseworkers for fear of being beaten. Furthermore, as N.W. was approximately one year old at the time of the relevant events, Robinson could not interview N.W. and, in light of the heinous and on-going nature of the alleged conduct, it was eminently reasonable to rely on and testify as to T.W.'s statements. Lastly, the pursuit of N.W.'s removal was nonetheless justified based upon the finding that T.W. was being abused. *See Taylor v. Evans*, 72 F. Supp. 2d 298, 307 (S.D.N.Y. 1999) (Haight, J.), (finding when doctor found one child had fractures indicative of child abuse and the guardian could not offer any explanation for the injury, emergency removal of other children in the home was justified); *see also* Defs.' Br. at 10 n.3 (collecting cases).

> ❖ **White admitted at her deposition that she did not believe that scratches were evidence of excessive corporal punishment, yet she allowed the scratches to be portrayed as evidence of excessive corporal punishment. Pls.' Opp. Br. at 10–11 (citing Dkt. 74-4 (Polias Aff. Ex. 3, Gladys White Dep. ("White Dep.") at 119–20)).**

White's acquiescence to having the aunt-inflicted scratches on T.W.'s face presented as evidence of excessive corporal punishment, despite her subjective belief, does not undermine Defendants' qualified immunity claim. In light of the subsequent statements T.W. made to caseworkers and the Family Court concerning the events surrounding his face being scratched, the alleged pervasiveness of corporal punishment at the Walker home, and the examples of the aunt engaging in reckless, violent domestic behavior, reasonable caseworkers could disagree as to whether the scratches constituted evidence of excessive corporal punishment. Furthermore, while White may have held the subjective belief that the scratches did constitute excessive corporal punishment, it was objectively reasonable for her to allow the scratches to be presented as evidence of impermissible punishment. *See Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001) (for purposes of qualified immunity, a government actor's "subjective beliefs . . . are irrelevant" and the inquiry will solely turn on the objective reasonableness of the act).

What remains are Plaintiffs' claims that Robinson proffered perjured testimony to the Family Court:

❖ Robinson stated in the Article 10 petition that she observed 2-3 marks and bruises on T.W.'s legs, arms, back, and stomach as well as 3-4 old bruises on each area. Pls.' Opp. Br. at 7. Plaintiffs compare this statement with Robinson's IPN notes that the marks on T.W.'s body were "not eviden[ce] of beatings." IPN at 8.

❖ Robinson testified that the marks on T.W.'s body were belt marks, yet she never made that conclusion before and had stated that the marks were "not eviden[ce] of beatings" in her IPN notes. Pls.' Opp. Br. at 14.

❖ While T.W. directly told Judge Hamill that Walker beat him with a belt, the judge only believed this because Robinson's perjury tainted the judge's opinion and approach to the *in camera* review. *Id.* at 15.

❖ Robinson testified on Feb. 25, 2010 that T.W. told her that the marks on his body were from beatings that he received from Walker and the aunt. *Id.* at 15–16. However, during the investigation, Plaintiffs contend that Robinson had previously noted that T.W.'s marks were from beatings solely from the aunt. *Id.*

In short, the question posed for this Court is whether these examples of testimony inconsistent with a caseworker's real-time notes are sufficiently material and serious to "override the necessary freedom of action that qualified immunity accords caseworker defendants[.]" *Cornejo*, 592 F.3d at 129. This Court holds that they are not. While the *Cornejo* court confronted a situation in which one child had already suffered fatal injuries, the exigency in removing T.W. and N.W. from the Walker home here was equally grave. Principally, not only was one of the Walker children alleging excessive corporal punishment, but he also informed caseworkers that he would face additional beatings for assisting caseworkers in their investigation. And T.W.'s statements about retaliation from Walker were not fleeting—T.W. physically restrained himself[11] from speaking directly to the caseworker. IPN at 14.

---

[11] According to the investigative notes, T.W. "became terrified when he saw [a caseworker], stating that he is not allow to speak with [caseworkers]. T.W. began to hide his face behind his

Furthermore, as with the preceding example, the question here is not what Robinson subjectively believed, but rather whether the evidence was interpreted and presented in an objectively reasonable fashion. *See Cerrone*, 246 F.3d at 202. It would have been objectively reasonable for Robinson, a caseworker and not a physician, to subsequently re-evaluate whether she thought the marks on T.W.'s body were evident of beatings after additional events developed in this action—of note, T.W.'s physically manifested fear of being beaten if Walker knew that he talked to an ACS caseworker and Walker's refusal to engage with ACS caseworkers to provide a justification for the marks on T.W.'s body. As Defendants aptly state in their brief: "if Robinson did not initially think the marks on T.W. to be indicative of abuse or neglect, that belief changed when the child expressed such intense fear of being beaten again by his father. It cannot be unreasonable, let alone unconstitutional, for a caseworker to re-evaluate prior evidence when new evidence comes to light." Dkt. 86 (Defs.' Opp. Br.) at 4 (internal citations and titles omitted). By the time of Robinson's petition and testimony, it was objectively reasonable for her to offer a more developed analysis of the source of T.W.'s bruises.

Additionally, it is indicative that caseworkers of reasonable competence could disagree as to the source of T.W.'s bruises that Judge Hamill, after *in camera* questioning and review of T.W., concluded:

> I also looked at this child's body, and he has a lot of marks all about his body, and he told me some of them were from bite marks, and some of, them, being mosquito bite marks, and some of them were from falling off his bike. But he also said a lot of them were from being beaten by a belt, by his father as well as by the aunt. So this is a child that in this Court's opinion has been beaten, and I need to make sure that he's safe, and he is not going to be beaten ever again.

---

hands stating that he is not to speak with [caseworkers] and if he does he will get into trouble. T.W. refused to speak" with Robinson and "became so upset at the presence of CPS that he stated that he wanted to scream." IPN at 14.

Dkt. 70-7 (Carey Decl. Ex. G, Family Court Transcript ("5/7/09 Trans.")) at 26. The fact that on two other occasions the Family Court held that these children had been neglected further bolsters the reasonableness of the analysis and conclusions drawn by Robinson in observing T.W.'s marks.

Plaintiffs argue that Robinson's statement that T.W. told her that his bruises were from both Walker and the aunt, whereas her notes state that T.W. said that the bruises were only from the aunt, should prevent qualified immunity. However, the Court holds that this statement does not undermine the otherwise objective reasonableness of the decisions made by Robinson throughout the proceedings. While it is unclear why Robinson's testimony differs from her notes, the consequences of her testimony were negligible, especially at that late stage in the Family Court proceedings. T.W. informed Robinson that he had been beaten by both his aunt and Walker, and that Walker had recently used a belt on his one-year-old brother. That Robinson either errantly or merely inconsistently testified, approximately one year after the initial allegations, should have been a matter for impeachment on cross-examination before the Family Court. Again, it is significant for the qualified immunity analysis that Judge Hamill, after personally interviewing T.W. and reviewing the bruises, determined that the marks came from T.W. being beaten with a belt by both Walker and the aunt. *See* 5/7/09 Trans. at 26.

As in *Cornejo*, testimony implicating both parents, even though there is exculpatory evidence in support of one parent, is merely a "sin of commission"—particularly when there are allegations of multiple instances of abuse. *See Cornejo*, 592 F.3d at 129 (the Second Circuit "has found no constitutional violation where caseworkers allegedly committed "sins of commission and omission in what they told and failed to tell . . . the Family Court Judge") (quoting *van Emrik,* 911 F.2d at 866). Robinson's conduct here is not an example of the intentional and consequential perjury or fabrication required to implode an otherwise proper invocation of qualified immunity.

*See id.* The nature of Robinson's misstatements must have been of greater gravity and consequence to bar the application of qualified immunity.

Accordingly, the objective reasonableness of Defendants Robinson and White's actions in relation to Plaintiffs' due process claims has been established. And because the federal malicious prosecution,[12] abuse of process, unlawful seizure, and retaliation[13] claims are all grounded on the same allegations underlying the due process claims, Defendants are also entitled to qualified immunity on those Section 1983 claims. *See id.* at 130 (holding that when § 1983 malicious prosecution claim is based on same grounds as § 1983 due process claims, the same qualified immunity analysis applies to both sets of claims).

## D. The Court Declines to Exercise Jurisdiction Over Plaintiffs' State Law Claims

When the federal claims are dismissed in an action with state law claims based on supplemental jurisdiction, the state claims should be dismissed as well. 28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998). In deciding whether to exercise supplemental jurisdiction, a federal district court balances the traditional "values of judicial economy, convenience, fairness, and comity[.]" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350). In accordance with the

---

[12] It is likely that no plaintiff in this action can even state a claim for a malicious prosecution as the "Adult Plaintiffs have not been seized, and Infant Plaintiffs have not been prosecuted." *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 380 (E.D.N.Y. 2011) (Gershon, J.).

[13] "In the case of a child protective investigation, the existence of a reasonable basis for the filing of a Family Court petition is sufficient to demonstrate that the government action would have been taken even in the absence of some retaliatory motive." *Graham v. City of New York*, 869 F. Supp. 2d 337, 352 (E.D.N.Y. 2012) (Weinstein, J.).

guiding principle that district courts will not typically maintain jurisdiction over the state claims once the anchoring federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment, Dkt. 69, is GRANTED in its entirety. Accordingly, Plaintiffs' motion for partial summary judgment, Dkt. 79, is DENIED. The Third Amended Complaint is hereby dismissed and the trial date adjourned *sine die*. The Clerk of Court is respectfully directed to close this action and enter judgment in favor of Defendants.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge

Dated: December 5, 2014
Brooklyn, New York